PILOT LIFE INSURANCE CO. *v.* DEDEAUX

No. 85–1043.   Argued January 21, 1987—Decided April 6, 1987

O'CONNOR, J., delivered the opinion for a unanimous Court.

*John E. Nolan, Jr.,* argued the cause for petitioner. With him on the briefs were *Paul J. Ondrasik, Jr., Antonia B. Ianniello, George F. Woodliff III,* and *David L. Bacon.*

*William C. Walker, Jr.,* argued the cause for respondent. With him on the brief was *William L. Denton.**

---

*\*Erwin N. Griswold, Jack H. Blaine, Phillip E. Stano,* and *John P. Dineen* filed a brief for the American Council of Life Insurance et al. as *amici curiae* urging reversal.

JUSTICE O'CONNOR delivered the opinion of the Court.

This case presents the question whether the Employee Retirement Income Security Act of 1974 (ERISA), 88 Stat. 829, as amended, 29 U. S. C. § 1001 *et seq.*, pre-empts state common law tort and contract actions asserting improper processing of a claim for benefits under an insured employee benefit plan.

## I

In March 1975, in Gulfport, Mississippi, respondent Everate W. Dedeaux injured his back in an accident related to his employment for Entex, Inc. (Entex). Entex had at this time a long term disability employee benefit plan established by purchasing a group insurance policy from petitioner, Pilot Life Insurance Co. (Pilot Life). Entex collected and matched its employees' contributions to the plan and forwarded those funds to Pilot Life; the employer also provided forms to its employees for processing disability claims, and forwarded completed forms to Pilot Life. Pilot Life bore the responsibility of determining who would receive disability benefits. Although Dedeaux sought permanent disability benefits following the 1975 accident, Pilot Life terminated his benefits after two years. During the following three years Dedeaux's benefits were reinstated and terminated by Pilot Life several times.

In 1980, Dedeaux instituted a diversity action against Pilot Life in the United States District Court for the Southern District of Mississippi. Dedeaux's complaint contained three counts: "Tortious Breach of Contract"; "Breach of Fiduciary Duties"; and "Fraud in the Inducement." App. 18–23. Dedeaux sought "[d]amages for failure to provide benefits under the insurance policy in a sum to be determined at the time of trial," "[g]eneral damages for mental and emotional distress and other incidental damages in the sum of $250,000.00," and "[p]unitive and exemplary damages in the

---

*Solicitor General Fried, Deputy Solicitor General Kuhl, Christopher J. Wright, George R. Salem,* and *Allen H. Feldman* filed a brief for the United States as *amicus curiae.*

sum of $500,000.00." *Id.*, at 23–24. Dedeaux did not assert any of the several causes of action available to him under ERISA, see *infra*, at 53.

At the close of discovery, Pilot Life moved for summary judgment, arguing that ERISA pre-empted Dedeaux's common law claim for failure to pay benefits on the group insurance policy. The District Court granted Pilot Life summary judgment, finding all Dedeaux's claims pre-empted. App. to Pet. Cert. 16a.

The Court of Appeals for the Fifth Circuit reversed, primarily on the basis of this Court's decision in *Metropolitan Life Ins. Co.* v. *Massachusetts*, 471 U. S. 724 (1985). See 770 F. 2d 1311 (1985). We granted certiorari, 478 U. S. 1004 (1986), and now reverse.

## II

In ERISA, Congress set out to

"protect . . . participants in employee benefit plans and their beneficiaries, by requiring the disclosure and reporting to participants and beneficiaries of financial and other information with respect thereto, by establishing standards of conduct, responsibility, and obligation for fiduciaries of employee benefit plans, and by providing for appropriate remedies, sanctions, and ready access to the Federal courts." § 2, as set forth in 29 U. S. C. § 1001(b).

ERISA comprehensively regulates, among other things, employee welfare benefit plans that, "through the purchase of insurance or otherwise," provide medical, surgical, or hospital care, or benefits in the event of sickness, accident, disability, or death. § 3(1), 29 U. S. C. § 1002(1).

Congress capped off the massive undertaking of ERISA with three provisions relating to the pre-emptive effect of the federal legislation:

"Except as provided in subsection (b) of this section [the saving clause], the provisions of this subchapter and

subchapter III of this chapter shall supersede any and all State laws insofar as they may now or hereafter relate to any employee benefit plan . . . ." § 514(a), as set forth in 29 U. S. C. § 1144(a) (pre-emption clause).

"Except as provided in subparagraph (B) [the deemer clause], nothing in this subchapter shall be construed to exempt or relieve any person from any law of any State which regulates insurance, banking, or securities." § 514(b)(2)(A), as set forth in 29 U. S. C. § 1144(b)(2)(A) (saving clause).

"Neither an employee benefit plan . . . nor any trust established under such a plan, shall be deemed to be an insurance company or other insurer, bank, trust company, or investment company or to be engaged in the business of insurance or banking for purposes of any law of any State purporting to regulate insurance companies, insurance contracts, banks, trust companies, or investment companies." § 514(b)(2)(B), 29 U. S. C. § 1144(b) (2)(B) (deemer clause).

To summarize the pure mechanics of the provisions quoted above: If a state law "relate[s] to . . . employee benefit plan[s]," it is pre-empted. § 514(a). The saving clause excepts from the pre-emption clause laws that "regulat[e] insurance." § 514(b)(2)(A). The deemer clause makes clear that a state law that "purport[s] to regulate insurance" cannot deem an employee benefit plan to be an insurance company. § 514(b)(2)(B).

"[T]he question whether a certain state action is pre-empted by federal law is one of congressional intent. '"The purpose of Congress is the ultimate touchstone."'" *Allis-Chalmers Corp.* v. *Lueck*, 471 U. S. 202, 208 (1985), quoting *Malone* v. *White Motor Corp.*, 435 U. S. 497, 504 (1978), quoting *Retail Clerks* v. *Schermerhorn*, 375 U. S. 96, 103 (1963). We have observed in the past that the express pre-

emption provisions of ERISA are deliberately expansive, and designed to "establish pension plan regulation as exclusively a federal concern." *Alessi* v. *Raybestos-Manhattan, Inc.*, 451 U. S. 504, 523 (1981). As we explained in *Shaw* v. *Delta Air Lines, Inc.*, 463 U. S. 85, 98 (1983):

> "The bill that became ERISA originally contained a limited pre-emption clause, applicable only to state laws relating to the specific subjects covered by ERISA. The Conference Committee rejected those provisions in favor of the present language, and indicated that section's pre-emptive scope was as broad as its language. See H. R. Conf. Rep. No. 93–1280, p. 383 (1974); S. Conf. Rep. No. 93–1090, p. 383 (1974)."

The House and Senate sponsors emphasized both the breadth and importance of the pre-emption provisions. Representative Dent described the "reservation to Federal authority [of] the sole power to regulate the field of employee benefit plans" as ERISA's "crowning achievement." 120 Cong. Rec. 29197 (1974). Senator Williams said:

> "It should be stressed that with the narrow exceptions specified in the bill, the substantive and enforcement provisions of the conference substitute are intended to preempt the field for Federal regulations, thus eliminating the threat of conflicting or inconsistent State and local regulation of employee benefit plans. This principle is intended to apply in its broadest sense to all actions of State or local governments, or any instrumentality thereof, which have the force or effect of law." *Id.*, at 29933.

See also *Shaw* v. *Delta Air Lines, Inc.*, *supra*, at 99–100, n. 20 (describing remarks of Sen. Javits).

In *Metropolitan Life*, this Court, noting that the pre-emption and saving clauses "perhaps are not a model of legislative drafting," 471 U. S., at 739, interpreted these clauses in relation to a Massachusetts statute that required minimum

mental health care benefits to be provided Massachusetts residents covered by general health insurance policies. The appellants in *Metropolitan Life* argued that the state statute, as applied to insurance policies purchased by employee health care plans regulated by ERISA, was pre-empted.

The Court concluded, first, that the Massachusetts statute did "relate to . . . employee benefit plan[s]," thus placing the state statute within the broad sweep of the pre-emption clause, § 514(a). *Metropolitan Life, supra,* at 739. However, the Court held that, because the state statute was one that "regulate[d] insurance," the saving clause prevented the state law from being pre-empted. In determining whether the Massachusetts statute regulated insurance, the Court was guided by case law interpreting the phrase "business of insurance" in the McCarran-Ferguson Act, 59 Stat. 33, as amended, 15 U. S. C. § 1011 *et seq.*

Given the "statutory complexity" of ERISA's three pre-emption provisions, *Metropolitan Life, supra,* at 740, as well as the wide variety of state statutory and decisional law arguably affected by the federal pre-emption provisions, it is not surprising that we are again called on to interpret these provisions.

## III

There is no dispute that the common law causes of action asserted in Dedeaux's complaint "relate to" an employee benefit plan and therefore fall under ERISA's express pre-emption clause, § 514(a). In both *Metropolitan Life, supra,* and *Shaw* v. *Delta Air Lines, Inc., supra,* at 96–100, we noted the expansive sweep of the pre-emption clause. In both cases "[t]he phrase 'relate to' was given its broad common-sense meaning, such that a state law 'relate[s] to' a benefit plan 'in the normal sense of the phrase, if it has a connection with or reference to such a plan.'" *Metropolitan Life, supra,* at 739, quoting *Shaw* v. *Delta Air Lines, supra,* at 97. In particular we have emphasized that the pre-emption clause is not limited to "state laws specifically de-

signed to affect employee benefit plans." *Shaw* v. *Delta Air Lines, supra,* at 98. The common law causes of action raised in Dedeaux's complaint, each based on alleged improper processing of a claim for benefits under an employee benefit plan, undoubtedly meet the criteria for pre-emption under § 514(a).

Unless these common law causes of action fall under an exception to § 514(a), therefore, they are expressly pre-empted. Although Dedeaux's complaint pleaded several state common law causes of action, before this Court Dedeaux has described only one of the three counts—called "tortious breach of contract" in the complaint, and "the Mississippi law of bad faith" in respondent's brief—as protected from the pre-emptive effect of § 514(a). The Mississippi law of bad faith, Dedeaux argues, is a law "which regulates insurance," and thus is saved from pre-emption by § 514(b)(2)(A).[1]

In *Metropolitan Life,* we were guided by several considerations in determining whether a state law falls under the saving clause. First, we took what guidance was available from a "common-sense view" of the language of the saving clause itself. 471 U. S., at 740. Second, we made use of the case law interpreting the phrase "business of insurance" under the McCarran-Ferguson Act, 15 U. S. C. § 1011 *et seq.,* in interpreting the saving clause.[2] Three criteria have been used to determine whether a practice falls under the "business of insurance" for purposes of the McCarran-Ferguson Act:

> "*[F]irst,* whether the practice has the effect of transferring or spreading a policyholder's risk; *second,* whether the practice is an integral part of the policy relationship

---

[1] Decisional law that "regulates insurance" may fall under the saving clause. The saving clause, § 514(b)(2)(A), covers "any law of any State." For purposes of § 514, "[t]he term 'State law' includes all laws, decisions, rules, regulations, or other State action having the effect of law, of any State." 29 U. S. C. §§ 1144(c)(1) and (2).

[2] The McCarran-Ferguson Act provides, in relevant part: "The business of insurance, and every person engaged therein, shall be subject to the laws of the several States which relate to the regulation or taxation of such business." 15 U. S. C. § 1012(a).

between the insurer and the insured; and *third*, whether the practice is limited to entities within the insurance industry." *Union Labor Life Ins. Co.* v. *Pireno*, 458 U. S. 119, 129 (1982) (emphasis in original).

In the present case, the considerations weighed in *Metropolitan Life* argue against the assertion that the Mississippi law of bad faith is a state law that "regulates insurance."

As early as 1915 the Mississippi Supreme Court had recognized that punitive damages were available in a contract case when "the act or omission constituting the breach of the contract amounts also to the commission of a tort." See *Hood* v. *Moffett*, 109 Miss. 757, 767, 69 So. 664, 666 (1915) (involving a physician's breach of a contract to attend to a woman at her approaching "accouchement"). In *American Railway Express Co.* v. *Bailey*, 142 Miss. 622, 631, 107 So. 761, 763 (1926), a case involving a failure of a finance company to deliver to the plaintiff the correct amount of money cabled to the plaintiff through the finance company's offices, the Mississippi Supreme Court explained that punitive damages could be available when the breach of contract was "attended by some intentional wrong, insult, abuse, or gross negligence, which amounts to an independent tort." In *Standard Life Insurance Co.* v. *Veal*, 354 So. 2d 239 (1977), the Mississippi Supreme Court, citing *D. L. Fair Lumber Co.* v. *Weems*, 196 Miss. 201, 16 So. 2d 770 (1944) (breach of contract was accompanied by "the breaking down and destruction of another's fence"), *American Railway Express Co.* v. *Bailey, supra*, and *Hood* v. *Moffett, supra*, upheld an award of punitive damages against a defendant insurance company for failure to pay on a credit life policy. Since *Veal*, the Mississippi Supreme Court has considered a large number of cases in which plaintiffs have sought punitive damages from insurance companies for failure to pay a claim under an insurance contract, and in a great many of these cases the court has used the identical formulation, first stated in *Bailey*, of what must "attend" the breach of contract in order for puni-

tive damages to be recoverable. See, *e. g.*, *Employers Mutual Casualty Co.* v. *Tompkins*, 490 So. 2d 897, 902 (1986); *State Farm Fire & Casualty Co.* v. *Simpson*, 477 So. 2d 242, 248 (1985); *Consolidated American Life Ins. Co.* v. *Toche*, 410 So. 2d 1303, 1304 (1982); *Gulf Guaranty Life Ins. Co.* v. *Kelley*, 389 So. 2d 920, 922 (1980); *State Farm Mutual Automobile Ins. Co.* v. *Roberts*, 379 So. 2d 321, 322 (1980); *New Hampshire Ins. Co.* v. *Smith*, 357 So. 2d 119, 121 (1978); *Lincoln National Life Ins. Co.* v. *Crews*, 341 So. 2d 1321, 1322 (1977). Recently the Mississippi Supreme Court stated that "[w]e have come to term an insurance carrier which refuses to pay a claim when there is no reasonably arguable basis to deny it as acting in 'bad faith,' and a lawsuit based upon such an arbitrary refusal as a 'bad faith' cause of action." *Blue Cross & Blue Shield of Mississippi, Inc.* v. *Campbell*, 466 So. 2d 833, 842 (1984).

Certainly a common-sense understanding of the phrase "regulates insurance" does not support the argument that the Mississippi law of bad faith falls under the saving clause. A common-sense view of the word "regulates" would lead to the conclusion that in order to regulate insurance, a law must not just have an impact on the insurance industry, but must be specifically directed toward that industry. Even though the Mississippi Supreme Court has identified its law of bad faith with the insurance industry, the roots of this law are firmly planted in the general principles of Mississippi tort and contract law. Any breach of contract, and not merely breach of an insurance contract, may lead to liability for punitive damages under Mississippi law.

Neither do the McCarran-Ferguson Act factors support the assertion that the Mississippi law of bad faith "regulates insurance." Unlike the mandated-benefits law at issue in *Metropolitan Life*, the Mississippi common law of bad faith does not effect a spreading of policyholder risk. The state common law of bad faith may be said to concern "the policy relationship between the insurer and the insured." The con-

nection to the insurer-insured relationship is attenuated at best, however. In contrast to the mandated-benefits law in *Metropolitan Life,* the common law of bad faith does not define the terms of the relationship between the insurer and the insured; it declares only that, whatever terms have been agreed upon in the insurance contract, a breach of that contract may in certain circumstances allow the policyholder to obtain punitive damages. The state common law of bad faith is therefore no more "integral" to the insurer-insured relationship than any State's general contract law is integral to a contract made in that State. Finally, as we have just noted, Mississippi's law of bad faith, even if associated with the insurance industry, has developed from general principles of tort and contract law available in any Mississippi breach of contract case. Cf. *Hart* v. *Orion Ins. Co.,* 453 F. 2d 1358 (CA10 1971) (general state arbitration statutes do not regulate the business of insurance under the McCarran-Ferguson Act); *Hamilton Life Ins. Co.* v. *Republic National Life Ins. Co.,* 408 F. 2d 606 (CA2 1969) (same). Accordingly, the Mississippi common law of bad faith at most meets one of the three criteria used to identify the "business of insurance" under the McCarran-Ferguson Act, and used in *Metropolitan Life* to identify laws that "regulat[e] insurance" under the saving clause.

In the present case, moreover, we are obliged in interpreting the saving clause to consider not only the factors by which we were guided in *Metropolitan Life,* but also the role of the saving clause in ERISA as a whole. On numerous occasions we have noted that "'"'[i]n expounding a statute, we must not be guided by a single sentence or member of a sentence, but look to the provisions of the whole law, and to its object and policy.'"'" *Kelly* v. *Robinson,* 479 U. S. 36, 43 (1986), quoting *Offshore Logistics, Inc.* v. *Tallentire,* 477 U. S. 207, 221 (1986) (quoting *Mastro Plastics Corp.* v. *NLRB,* 350 U. S. 270, 285 (1956) (in turn quoting *United States* v. *Heirs of Boisdoré,* 8 How. 113, 122 (1849))). Because in this case,

the state cause of action seeks remedies for the improper processing of a claim for benefits under an ERISA-regulated plan, our understanding of the saving clause must be informed by the legislative intent concerning the civil enforcement provisions provided by ERISA § 502(a), 29 U. S. C. § 1132(a).

The Solicitor General, for the United States as *amicus curiae*, argues that Congress clearly expressed an intent that the civil enforcement provisions of ERISA § 502(a) be the exclusive vehicle for actions by ERISA-plan participants and beneficiaries asserting improper processing of a claim for benefits, and that varying state causes of action for claims within the scope of § 502(a) would pose an obstacle to the purposes and objectives of Congress. Brief for United States as *Amicus Curiae* 18–19. We agree. The conclusion that § 502(a) was intended to be exclusive is supported, first, by the language and structure of the civil enforcement provisions, and second, by legislative history in which Congress declared that the pre-emptive force of § 502(a) was modeled on the exclusive remedy provided by § 301 of the Labor Management Relations Act, 1947 (LMRA), 61 Stat. 156, 29 U. S. C. § 185.

The civil enforcement scheme of § 502(a) is one of the essential tools for accomplishing the stated purposes of ERISA.[3] The civil enforcement scheme is sandwiched be-

---

[3] Section 502(a), as set forth in 29 U. S. C. § 1132(a), provides:

"A civil action may be brought—

"(1) by a participant or beneficiary—

"(A) for the relief provided for in subsection (c) of this section [concerning requests to the administrator for information], or

"(B) to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan;

"(2) by the Secretary, or by a participant, beneficiary or fiduciary for appropriate relief under section 1109 of this title [breach of fiduciary duty];

"(3) by a participant, beneficiary, or fiduciary (A) to enjoin any act or practice which violates any provision of this subchapter or the terms of the

tween two other ERISA provisions relevant to enforcement of ERISA and to the processing of a claim for benefits under an employee benefit plan. Section 501, 29 U. S. C. § 1131, authorizes criminal penalties for violations of the reporting and disclosure provisions of ERISA. Section 503, 29 U. S. C. § 1133, requires every employee benefit plan to comply with Department of Labor regulations on giving notice to any participant or beneficiary whose claim for benefits has been denied, and affording a reasonable opportunity for review of the decision denying the claim. Under the civil enforcement provisions of § 502(a), a plan participant or beneficiary may sue to recover benefits due under the plan, to enforce the participant's rights under the plan, or to clarify rights to future benefits. Relief may take the form of accrued benefits due, a declaratory judgment on entitlement to benefits, or an injunction against a plan administrator's improper refusal to pay benefits. A participant or beneficiary may also bring a cause of action for breach of fiduciary duty, and under this cause of action may seek removal of the fiduciary. §§ 502(a)(2), 409. In an action under these civil enforcement provisions, the court in its discretion may allow an award of attorney's fees to either party. § 502(g). See *Massachusetts Mutual Life Ins. Co.* v. *Russell*, 473 U. S. 134, 147 (1985). In *Russell*, we concluded that ERISA's breach of fiduciary duty provision, § 409(a), 29 U. S. C.

---

plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this subchapter or the terms of the plan;

"(4) by the Secretary, or by a participant, or beneficiary for appropriate relief in the case of a violation of 1025(c) of this title [information to be furnished to participants];

"(5) except as otherwise provided in subsection (b) of this subsection, by the Secretary (A) to enjoin any act or practice which violates any provision of this subchapter, or (B) to obtain other appropriate equitable relief (i) to redress such violation or (ii) to enforce any provision of this subchapter;

"(6) by the Secretary to collect any civil penalty under subsection (i) of this section."

§ 1109(a), provided no express authority for an award of punitive damages to a beneficiary. Moreover, we declined to find an implied cause of action for punitive damages in that section, noting that " '[t]he presumption that a remedy was deliberately omitted from a statute is strongest when Congress has enacted a comprehensive legislative scheme including an integrated system of procedures for enforcement.' " *Russell, supra,* at 147, quoting *Northwest Airlines, Inc.* v. *Transport Workers,* 451 U. S. 77, 97 (1981). Our examination of these provisions made us "reluctant to tamper with an enforcement scheme crafted with such evident care as the one in ERISA." *Russell, supra,* at 147.

In sum, the detailed provisions of § 502(a) set forth a comprehensive civil enforcement scheme that represents a careful balancing of the need for prompt and fair claims settlement procedures against the public interest in encouraging the formation of employee benefit plans. The policy choices reflected in the inclusion of certain remedies and the exclusion of others under the federal scheme would be completely undermined if ERISA-plan participants and beneficiaries were free to obtain remedies under state law that Congress rejected in ERISA. "The six carefully integrated civil enforcement provisions found in § 502(a) of the statute as finally enacted . . . provide strong evidence that Congress did *not* intend to authorize other remedies that it simply forgot to incorporate expressly." *Russell, supra,* at 146 (emphasis in original).

The deliberate care with which ERISA's civil enforcement remedies were drafted and the balancing of policies embodied in its choice of remedies argue strongly for the conclusion that ERISA's civil enforcement remedies were intended to be exclusive. This conclusion is fully confirmed by the legislative history of the civil enforcement provision. The legislative history demonstrates that the pre-emptive force of § 502(a) was modeled after § 301 of the LMRA.

The Conference Report on ERISA describing the civil enforcement provisions of § 502(a) says:

"Under the conference agreement, civil actions may be brought by a participant or beneficiary to recover benefits due under the plan, to clarify rights to receive future benefits under the plan, and for relief from breach of fiduciary responsibility. . . . [W]ith respect to suits to enforce benefit rights under the plan or to recover benefits under the plan which do not involve application of the title I provisions, they may be brought not only in U. S. district courts but also in State courts of competent jurisdiction. *All such actions in Federal or State courts are to be regarded as arising under the laws of the United States in similar fashion to those brought under section 301 of the Labor-Management Relations Act of 1947.*" H. R. Conf. Rep. No. 93–1280, p. 327 (1974) (emphasis added).

Congress was well aware that the powerful pre-emptive force of § 301 of the LMRA displaced all state actions for violation of contracts between an employer and a labor organization, even when the state action purported to authorize a remedy unavailable under the federal provision. Section 301 pre-empts any "state-law claim [whose resolution] is substantially dependent upon the analysis of the terms of an agreement made between the parties in a labor contract." *Allis-Chalmers Corp.* v. *Lueck,* 471 U. S., at 220. As we observed in *Allis-Chalmers,* the broad pre-emptive effect of § 301 was first analyzed in *Teamsters* v. *Lucas Flour Co.,* 369 U. S. 95 (1962). In *Lucas Flour* the Court found that "[t]he dimensions of § 301 require the conclusion that substantive principles of federal labor law must be paramount in the area covered by the statute." *Id.,* at 103. "[I]n enacting § 301 Congress intended doctrines of federal labor law uniformly to prevail over inconsistent local rules." *Id.,* at 104. Indeed, for purposes of determining federal jurisdiction, this Court has singled out § 301 of the LMRA as having "pre-emptive

force . . . so powerful as to displace entirely any state cause of action 'for violation of contracts between an employer and a labor organization.' Any such suit is purely a creature of federal law . . . ." *Franchise Tax Board of Cal.* v. *Construction Laborers Vacation Trust for Southern Cal.*, 463 U. S. 1, 23 (1983), referring to *Avco Corp.* v. *Machinists*, 390 U. S. 557 (1968).

Congress' specific reference to § 301 of the LMRA to describe the civil enforcement scheme of ERISA makes clear its intention that all suits brought by beneficiaries or participants asserting improper processing of claims under ERISA-regulated plans be treated as federal questions governed by § 502(a). See also H. R. Rep. No. 93–533, p. 12 (1973), reprinted in 2 Senate Committee on Labor and Public Welfare, Legislative History of ERISA, 94th Cong., 2d Sess., 2359 (Comm. Print 1976) ("The uniformity of decision which the Act is designed to foster will help administrators, fiduciaries and participants to predict the legality of proposed actions without the necessity of reference to varying state laws"); 120 Cong. Rec. 29933 (1974) (remarks of Sen. Williams) (suits involving claims for benefits "will be regarded as arising under the laws of the United States, in similar fashion to those brought under section 301 of the Labor Management Relations Act"); *id.*, at 29942 (remarks of Sen. Javits) ("[i]t is also intended that a body of Federal substantive law will be developed by the courts to deal with issues involving rights and obligations under private welfare and pension plans"). The expectations that a federal common law of rights and obligations under ERISA-regulated plans would develop, indeed, the entire comparison of ERISA's § 502(a) to § 301 of the LMRA, would make little sense if the remedies available to ERISA participants and beneficiaries under § 502(a) could be supplemented or supplanted by varying state laws.

In *Metropolitan Life Ins. Co.* v. *Massachusetts*, 471 U. S., at 746, this Court rejected an interpretation of the saving clause of ERISA's express pre-emption provisions, § 514(b)(2)(A), 29 U. S. C. § 1144(b)(2)(A), that saved from pre-

emption "only state regulations unrelated to the substantive provisions of ERISA," finding that "[n]othing in the language, structure, or legislative history of the Act" supported this reading of the saving clause. *Metropolitan Life*, however, did not involve a state law that conflicted with a substantive provision of ERISA. Therefore the Court's general observation—that state laws related to ERISA may also fall under the saving clause—was not focused on any particular relationship or conflict between a substantive provision of ERISA and a state law. In particular, the Court had no occasion to consider in *Metropolitan Life* the question raised in the present case: whether Congress might clearly express, through the structure and legislative history of a particular substantive provision of ERISA, an intention that the federal remedy provided by that provision displace state causes of action. Our resolution of this different question does not conflict with the Court's earlier general observations in *Metropolitan Life*.

Considering the common-sense understanding of the saving clause, the McCarran-Ferguson Act factors defining the business of insurance, and, most importantly, the clear expression of congressional intent that ERISA's civil enforcement scheme be exclusive, we conclude that Dedeaux's state law suit asserting improper processing of a claim for benefits under an ERISA-regulated plan is not saved by §514(b)(2)(A), and therefore is pre-empted by §514(a).[4] Accordingly, the judgment of the Court of Appeals is

*Reversed.*

---

[4] Because we conclude that Dedeaux's state common law claims fall under the ERISA pre-emption clause and are not rescued by the saving clause, we need not reach petitioner's argument that when an insurance company is engaged in the processing and review of claims for benefits under an employee benefit plan, it is acting in place of the plan's trustees and should be protected from direct state regulation by the deemer clause.