**Alan SILVERMAN, Plaintiff,**

v.

**BARBIZON SCHOOL OF MODELING & FASHION, INC., Ronald S. Roberts, Defendants.**

No. 87–2114–CIV.

United States District Court, S.D. Florida.

Aug. 24, 1989.

---

Richard Manas, Miami, Fla., for plaintiff.

Fred E. Glickman, Miami, Fla., for defendants.

MEMORANDUM OPINION

SPELLMAN, District Judge.

### FINAL JUDGMENT AND FINDINGS OF FACT AND CONCLUSIONS OF LAW

THIS CAUSE was tried before this Court without a jury on July 12, 13, 17 and 18, 1989. Upon careful consideration of the record, the exhibits, and the post-trial memorandum filed by the parties, this Court makes the following findings of fact and conclusions of law.

### FINDINGS OF FACT

#### A. *The ERISA claim*

Plaintiff, ALAN SILVERMAN ("Silverman") is a citizen and resident of Dade County, Florida. Defendant, BARBIZON SCHOOL OF MODELING & FASHION, INC. ("Barbizon") is a Florida corporation and an employer within the meaning of ERISA § 3(5), 29 U.S.C. § 1002(5). Defendant, RONALD S. ROBERTS ("Roberts"), is a citizen and resident of Dade County, Florida, and was the sole owner of Barbizon.

Barbizon was a sponsor and Plan Administrator of an employee profit sharing plan known as the Barbizon School of Modeling & Fashion, Inc. Profit Sharing Plan and of an employee pension plan known as the Barbizon School of Modeling & Fashion, Inc. Pension Plan. These plans were employee benefit plans within the meaning of ERISA §§ 3(16)(A), 3(16)(B) and 201, 29 U.S.C. §§ 1002(16)(A) and (B) and § 1051. Roberts was the "Trustee" of the plans

within the meaning of ERISA § 403(a), 29 U.S.C. § 1103(a).

In 1975, Roberts purchased Barbizon, which operated two charm schools, one in Coral Gables and one in Ft. Lauderdale. In 1978, the Coral Gables school was losing money and in danger of closing. In September, 1978, Silverman contacted Roberts to inquire about purchasing the Coral Gables school. Although Roberts did not want to sell at that time, Roberts and Silverman discussed a year's trial employment, after which there was to be discussion of a partnership.

Roberts confirmed the employment relationship in his letter dated October 9, 1978. The letter stated that Roberts would pay Silverman a salary, certain benefits, and 10% of the net profits. The term of employment was for one year, but the letter specifically provided that the employment was "terminable at will." Silverman accepted the arrangement and began work on November 1, 1978, with the expectation that if things worked out, he would be able to enter into a partnership arrangement with Roberts.

Before the year was complete, and in recognition of Silverman's success, and to induce Silverman to stay with Barbizon, Roberts proposed a deal to Silverman under which Silverman could become half owner of Barbizon at the end of ten years. This agreement was memoralized in an Option Agreement executed November 29, 1979.

As a result of the Option Agreement, Silverman was made the beneficiary of $150,000 of the proceeds of a $200,000 insurance policy on Roberts' life, paid for by Barbizon, with the proviso that, upon Roberts' death, Silverman would be able to purchase the entire outstanding common stock of the Coral Gables school for $150,-000. Additionally, Silverman was granted an option to purchase one half of the outstanding stock of Barbizon for $75,000, to be funded by Barbizon through a deferred compensation agreement under which Silverman would have at least $75,000 in benefits payable as of January 1, 1990. The option to purchase one half of Barbizon could only be exercised if Silverman remained continuously employed with Barbizon. Silverman was also to receive 25% of the net profits of Barbizon, payable monthly.

Bert Rudick, Barbizon's insurance agent presented the original agreement to Silverman and testified that the agreement was "designed to keep [Silverman] there for a ten year period." This original proposal and the subsequent Option Agreement were designed to induce Silverman to remain with Barbizon for at least a ten year period, and reward him for so doing by allowing Silverman to purchase one half of the business with the funds in his deferred compensation plans. The plans were created, effective January 1, 1980, for that specific purpose.

There were two subsequent amendments to the Option Agreement, in January and February of 1985. Those amendments clarified that the one half interest that Silverman could purchase was a one half interest in the Coral Gables school and did not include the Ft. Lauderdale school. The Amendments also increased the purchase price of the one half interest to whatever amount was contained in the plans after ten years and moved the purchase date from January 1990 to September 1989.

The Option Agreement, with the subsequent Amendments, constituted an agreement under ERISA, especially in light of the Agreements integral connection with the pension plan and the profit sharing plan. The Option Agreement, however, was not an employment contract, and while the Agreement did contemplate a ten year term of employment, and in fact was created to induce Silverman to remain for the ten year period, Silverman's employment was terminable at will.

Although Silverman's employment was terminable at will, under ERISA, an employer may not terminate a participant in order to deprive that participant of a right provided to the employee under any ERISA plan. ERISA provides in pertinent part that:

It shall be unlawful for any person to discharge ... a participant ... for the

purpose of interfering with the attainment of any right to which such participant may become entitled under the plan.

Therefore, although Roberts could terminate Silverman's employment at will, Roberts could not do so if Roberts' reasons were merely pretextual and the termination was intended to deprive Silverman of his rights under the Agreement.

### B.  Silverman's Termination

During the period from November, 1980, through February, 1987, the school prospered and no dissatisfaction was expressed to Silverman about his job performance. Sales increased dramatically and the school became profitable. Roberts was quite satisfied with the turnaround that the school experienced, and attributed this turnaround to Silverman's sales procedures and the employees hired and trained by Silverman. Roberts spoke highly about Silverman and was not informed of any problems in the school regarding Silverman's behavior or job performance.

Roberts left the operations of the school largely in Silverman's hands. Every year, Roberts spent three months in North Carolina, and Silverman ran the school in his absence. When Roberts was in town, he spent his time at the school, and at all times, even while in North Carolina, Roberts managed the financial affairs of the school. Both Roberts' wife and his stepdaughter worked at the school and had responsibilities which did not overlap with Silverman's responsibilities.

In October, 1984, Roberts became seriously ill during a trip to Cairo. As a consequence, Roberts was disabled from carrying on his normal duties at the school. Roberts came to the school only occasionally, and collected full disability payments for over two years. Silverman was in almost complete charge of the operations of the school, but had no responsibilities for any of the financial affairs. Roberts continued to handle the financial affairs of the school from his home.

On March 8, 1987, a Sunday, Roberts called Silverman to discuss the termination of a part-time employee. Roberts and his wife testified that Silverman responded with obscenities directed at Roberts personally. Although Silverman testified that he had never used such language, and Silverman's wife testified that she had never heard Silverman use any obscenity, this Court finds that Silverman did, in fact, make the obscene comment, based upon this Court's obligation as trier of the facts to resolve conflicts in the evidence based on issues of credibility. The Court therefore accepts the testimony of the Roberts and rejects that of the Silvermans.

This telephone conversation precipitated a meeting between Roberts and Silverman on March 23, 1987. Roberts was concerned about the profanity directed at him during that telephone conversation and about the amount of time that Silverman was spending at the school. At that time, Roberts requested Silverman's office keys and told Silverman to remain at home until Roberts had reached a decision whether or not to fire Silverman. Silverman complied with Roberts' instructions.

On March 30, 1987, one week later, Roberts discharged Silverman by letter. This letter was followed by a letter from Roberts' attorneys which stated that the termination was effective as of March 23, 1987. However, the testimony revealed that after the meeting on March 23, 1987, between Roberts and Silverman, Silverman went home to await Roberts' decision on whether or not to terminate Silverman, and in fact communicated with Roberts to see if he had been fired.

Roberts spent the week between the meeting and the termination investigating allegations concerning Silverman's behavior at the school. Specifically, three areas of concern surfaced during Roberts' investigation: 1) Silverman's use of profanity; 2) Silverman's inappropriate behavior towards female staff and students; and 3) Silverman's habit of leaving before the school closed.

The testimony revealed that there was good cause to terminate Silverman, especially in light of Silverman's behavior while Roberts was ill. There was testimony to

the effect that Silverman often used profanity at the school—both in front of staff and students. Several witnesses testified that Silverman had a bad temper, and when under stress would frequently use loud and profane language.

There was testimony that Silverman made lewd comments and gestures directed at, and in front of, students and teachers. Silverman was observed putting his arm around teachers, other staff, and students, kissing students and teachers on the cheek, and patting a teacher on the behind.

Silverman admitted that although one of his main functions was as a "closer," he testified that he usually left the school between 8:30 and 8:45 p.m. The evidence revealed that he often left earlier, between 8:15 and 8:30 p.m. A "closer" is one who finalizes a sale when the sales person is for some reason unable to do so. Silverman was particularly adept at closing sales, and sales personnel relied on him for this assistance. For this reason, Roberts expected Silverman to remain until the school closed at 9:00 p.m. It was also extremely important for a responsible person to be present at the time the school closed to assist younger students whose parents were either late or neglected to pick up their children at 9:00 p.m.

Silverman acknowledged that in a business such as Barbizon, no person should ever put an arm around a student and that no administrative personnel should ever put an arm around one of the teachers or other staff. Silverman also agreed that a male should not slap a female on the fanny and that it has no business in any business. Silverman further agreed that especially in a charm school, the use of profanity is improper regardless of whether the students are young or old, and regardless of whether they are male or female.

A few witnesses testified that Silverman always behaved like a gentleman in their presence, and that those witnesses had never heard Silverman use profanity; however, the weight of the evidence established that Silverman did, in fact, have a habit of using profanity, especially during the end of his tenure and while Roberts was out ill.

Roberts did not learn of this behavior until he had returned to work after his illness, although there was evidence that this behavior had existed in some degree that entire time that Silverman was employed. The behavior became much more open and offensive during Robert's illness, when Silverman had more control over the school's operation. Although this behavior was not new, Roberts had not been told because of concerns about his illness and how such news, and the necessity of trying to find a replacement, might effect Roberts. Barbizon needed Silverman during Roberts' illness, and therefore, nothing was done until after Roberts had recovered, and after the insulting phone conversation triggered the investigation. Once Roberts began to inquire about Silverman's behavior, many persons who had remained silent, came forward. Their reports confirmed Roberts suspicion that Silverman's behavior was inappropriate and that Silverman was not a person Roberts wished to become partners with. Roberts testified that he felt that Silverman had no respect for him, and this was the final factor in Robert's decision to terminate Silverman.

Roberts terminated Silverman for a combination of reasons. Roberts was concerned about the potential threat of litigation because of conduct around the students; Roberts felt that Silverman was not working his best; and Roberts felt that Silverman was acting like a tyrant and had no respect for Roberts. Putting all of the incidents discovered by Roberts during his investigation together with the outburst and profanity used in the telephone conversation between Roberts and Silverman, Roberts did not feel that Silverman could remain his employee, much less become his partner in the business. While it may have been better if Roberts had warned Silverman about his behavior before terminating him, and given Silverman a chance to correct this behavior, this Court cannot find that Silverman was fired without cause, or to interfere or terminate any of Silverman's rights under any of the plans.

Additionally, although Silverman can not realize the opportunity to purchase one half

of the Coral Gables school, because he was not continuously employed until September, 1989, Silverman is fully vested in both the pension plan and the profit sharing plan and is entitled to those benefits. Roberts is aware of, and concedes, that fact. Accordingly, Silverman was terminated due to misconduct and not to interfere or terminate any rights that Silverman might have had under the pension or profit sharing plans.

## C. Bonus and Accounting

■ Silverman is also seeking recovery of additional bonus money or an accounting to determine what additional amounts, if any, should have been paid to him. Silverman's compensation included a salary plus monthly bonuses equal to 25% of profits after deducting business expenses. The parties never defined profits, or which income and expenses were to be factored into the computation of the bonuses. Those calculations were to a large degree discretionary on Roberts' part, and no guidelines were ever set by the parties. The oral agreement between the parties seems to have been that Roberts would calculate the bonus, and Silverman would accept his calculations. Only certain items were discussed and those items were included or excluded by agreement, or by practice. This Court will not now renegotiate this oral agreement.

Roberts is a sophisticated business man who has, over his lifetime, owned and operated a number of businesses. During the period of Silverman's employment, Roberts was in charge of all bookkeeping and record keeping and accounts payable of Barbizon with respect to compensation paid to Silverman and from which contributions to the plans were determined. Silverman, however, had access to all the records and books of the school, as well as to the bills. Silverman also had the responsibility of making the daily bank deposits.

Silverman rarely questioned Roberts about how Roberts figured his monthly bonus. Once in a while, they discussed certain items to establish whether those items were included. For example, they agreed that income from the agency program, fashion merchandising program, cosmetics sales, and graduation tickets would not be included in the calculations of Silverman's bonus. At the same time, Silverman was not charged for expenses relating to those items.

Roberts did take additional salary, in the months of February, 1983, and March, 1983, totaling $834. Silverman's bonus should have included 25% of that amount, or $209. This amount, however, is more than offset by expenses that Roberts could have charged, but did not, against Silverman's bonus.

Roberts is countersuing for $74,070.75, which Roberts claims he overpaid Silverman. Specifically, Roberts contends that he erroneously overpaid Silverman $16,969.25 and further overpaid Silverman $57,101.50 because Roberts voluntarily chose not to deduct certain expenses that he could have legitimately deducted.

Roberts is not entitled to recover these amounts. First, Roberts cannot now be heard to complain about expenses voluntarily not deducted. That choice was made long ago. Second, Roberts alone was responsible for calculating the amount of bonus, and Silverman never questioned his calculations. Silverman relied on those calculation and Roberts cannot now complain that he may have miscalculated certain bonuses.

At the same time, Silverman cannot be heard to complain that Roberts may have taken into account expenses which were not proper. For example, Roberts subtracted expenses for the pension and profit sharing contributions, amortization for a computer and capital improvements arising from the school's move from Coral Gables to Flagler Street. Roberts also failed to allocate certain expenses between the Coral Gables and the Ft. Lauderdale schools.

Some of these complaints might have been discussed and worked out by the parties during the course of the agreement, as other disputes were. Silverman never questioned those items and cannot now question them, without granting Roberts the same right to include other expenses.

CONCLUSIONS OF LAW

*A. The ERISA claim*

The Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. § 1001, *et seq.* is a comprehensive statute designed to promote the interests of employees covered by employee benefit plans. The extraordinarily broad scope of this statute is seen in § 1002(1) which provides:

The terms "employee welfare benefit plan" and "welfare plan" mean *any plan, fund or program* which was heretofore or is hereafter established or maintained by an employer ... to the extent that *such plan, fund, or program* was established or is maintained for the purpose of providing its participants of their beneficiaries, through the purpose of insurance or *otherwise*.... (Emphasis added).

■ The primary purpose behind ERISA was to achieve uniformity in employee welfare plan laws. ERISA therefore preempts all state laws and causes of action which "relate to" ERISA plans either directly or indirectly. *Howard v. Parisian, Inc.,* 807 F.2d 1560, 1563 (11th Cir.1987). The Supreme Court of the United States confirmed the broad scope of ERISA preemption in two companion decisions entered April 6, 1987—*Pilot Life Insurance Co. v. Dedeaux,* 481 U.S. 41, 107 S.Ct. 1549, 95 L.Ed.2d 39 (1987) and *Metropolitan Life Insurance Company v. Taylor,* 481 U.S. 58, 107 S.Ct. 1542, 95 L.Ed.2d 55 (1987). Those cases held that state law causes of action, including tort and breach of contract claims, were all preempted under ERISA.

■ In the case *sub judice,* the Option Agreement entered into by the parties is integrally connected to the profit sharing plan and the pension plan, plans undeniably covered by ERISA. Those plans were actually created for the purpose of funding the Option Agreement. The Option Agreement was dependent upon, and a benefit derived, from the Pension and Profit Sharing Plans. The use of the plans to fund the Option Agreement was an intended use, and therefore, the Option Agreement is entangled with the plans to such an extent that the Option Agreement itself is covered by ERISA. The fact that the Option Agreement was a separate document from the plan documents makes no difference. An ERISA plan can exist even in the absence of a written instrument. *Donovan v. Dillingham,* 688 F.2d 1367, 1372 (11th Cir. 1982). Here, there is a written document, the Option Agreement and its Amendments, and those documents refer specifically to the Profit Sharing and Pension Plans.

ERISA § 502, 29 U.S.C. § 1132, provides in pertinent part:

Section 502. (a) A civil action may be brought

(1) by a participant or beneficiary—

(B) to recover benefits due him under the terms of the plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan;

Therefore, Silverman, as a benefit plan participant, properly brought this action as an ERISA claim, and all other state law claims "relating to" the agreement are preempted.

*B. Silverman's Termination*

■ The Option Agreement, with its subsequent Amendments, is covered under ERISA; however, the Option Agreement is not an employment contract, and while the Agreement did contemplate a ten year term of employment, and in fact was created to induce Silverman to remain for the ten year period, Silverman's employment was terminable at will.

Even though Silverman's employment was terminable at will, ERISA § 510, 29 U.S.C. § 1140, provides that:

It shall be unlawful for any person to discharge, fine, suspend, expel, discipline, or discriminate against a participant or beneficiary for exercising any right to which he is entitled under the provisions of an employee benefit plan, this subchapter, section 1201 of this title, or the Welfare and Pension Plans Disclosure Act [29 U.S.C.A. § 301 *et seq.*], *or for the purpose of interfering with the attainment of any right to which a participant may be entitled under the*

*plan*, this subchapter, or the Welfare and Pension Plans Disclosure Act. * * * The provisions of section 1132 of this title shall be applicable in the enforcement of this section. (Emphasis added).

Therefore, ERISA § 510 exists "to prevent retaliation against a plan participant or beneficiary for exercising rights under the plan or to prevent interference with the attainment of any rights to which he or she may become entitled." *Kross v. Western Electric Co., Inc.*, 534 F.Supp. 251, 254 (D.C.Ill.1982), *affirmed in part, reversed in part on other grounds*, 701 F.2d 1238 (7th Cir.1983). Thus § 510 is an exception to the doctrine of employment at will. If Silverman proved that his termination was prompted by Roberts' desire to prevent him from exercising his right to purchase one half share of Barbizon at the end of his ten years employment, Silverman could recover under ERISA. In order to do so, Silverman would have had to show that the reasons Roberts gave for his termination were mere pretext and that the true purpose of the discharge was to deprive claimant of benefits. *Rose v. Intelogic Trace, Inc.*, 652 F.Supp. 1328, 1330 (W.D.Tex.1987); *Bradley v. Capital Engineering & Mfg. Co.*, 678 F.Supp. 1330, 1336 (N.D.Ill.1988). As discussed above in the findings of fact, the evidence established that there was good cause to terminate Silverman, and Roberts' reasons were not pretextual.

Silverman, in order to buttress his claim of discrimination, attempted to show that Roberts had engaged in prior discriminatory acts and conduct with respect to benefit plan rights. First, Dorothy Girard, the manager of the Ft. Lauderdale school, testified that Roberts requested that she terminate an employee because that employee would soon be eligible for the pension plan. Silverman testified to the same effect concerning an employee in the Miami school. Both witnesses, however, testified that the employees were not terminated for that reason, and, in fact, Roberts never brought the matter up again after they initially rejected his request to fire those employees. It is only reasonable to assume that if Roberts had intended to fire those employees in order to deprive them of their rights, he would have done so.

Second, Plaintiff attempted to show that Dorothy Girard was also terminated in order to prevent her from exercising an option to purchase one half interest in the Ft. Lauderdale school. The testimony revealed, however, that this agreement was never finalized, and that Dorothy Girard was terminated after informing Roberts that she wished to leave her employment. Roberts then spent time obtaining a replacement for her position, and that replacement was trained by Silverman at the Miami school. Although Ms. Girard was not informed that a replacement had been found or that her request to leave was being acted upon, there was no evidence to support the contention that Ms. Girard was terminated in order to deprive her of any rights under any benefit plan. This Court did, however, find it unfortunate that her actual termination, on December 22, 1986, was without notice.

### C. Bonus and Accounting

The conflicting claims as to underpayment or overpayment of Silverman's bonus would require an extensive and complicated accounting. That accounting, however, even if undertaken, would not, and could not, establish what the parties intended when they originally entered into the bonus agreement. Therefore, this Court finds that neither party is entitled to recover for the bonus payments, nor will this Court order an accounting to remake this agreement. Accordingly, it is hereby

ORDERED AND ADJUDGED that final judgment is entered in favor of Defendants on Plaintiff's claims and Plaintiff shall go hence without day.

It is further ORDERED that final judgment is entered in favor of Plaintiff on Defendants' counterclaim and Defendants shall go hence without day.

Each party shall bear their own costs and attorneys fees.

DONE AND ORDERED.