Grover MARKS, et al, Plaintiffs,

v.

**WEST VIRGINIA DEPARTMENT OF
HEALTH & HUMAN RESOURCES,
et al, Defendants.**

No. CIV.A. 2:01–0961.

United States District Court,
S.D. West Virginia,
Charleston Division.

Jan. 25, 2002.

Mary Donne Peters, James W. Standard, Jr., Gorby, Reeves, Peters & Burns, Atlanta, GA, Timothy R. Miley, La Neve & Miley, Clarksburg, WV, for Plaintiffs.

Steven P. McGowan, Nora Clevenger Price, Steptoe & Johnson, Charleston, WV, for Defendants Jack Clohan, Florence Hatton, West Virginia Department of Health & Human Resources and William R. Sharpe Jr. Hospital.

David L. Shuman, Melissa A. Morris, Shuman, McCuskey & Slicer, PLLC, Charleston, WV, for Defendants Ahmed Aboraya, M.D., Safiullah Syed, M.D., West Virginia University Board of Trustees, Scott Pollard, M.D.

Charles R. Bailey, Bailey & Wyant, Charleston, WV, for Defendant Richard Seime.

William F. Foster, II, Kay, Casto & Chaney PLLC, Charleston, WV, for Defendants West Virginia University Hospitals, Inc. and Psychiatric Institute of West Virginia.

David L. Delk, Jr., Bachmann, Hess, Bachmann & Garden, Wheeling, WV, for Defendant Ramsay Health Care, Inc.

Thomas V. Flaherty, Mark A. Glover, Flaherty, Sensabaugh & Bonasso, Charleston, WV, for Defendants Shelley Watters, R.N., and Mainstay of Central West Virginia Managed Care Services.

J. Victor Flanagan, Molly K. Underwood, Pullin, Knopf, Fowler & Flanagan, Charleston, WV, for Defendant Abe Adel, M.D.

Kathlene Harmon–McQueen, Glen A. Murphy, McQueen Harmon & Potter, Charleston, WV, for Defendant Great West Life and Annuity Insurance Company.

Eric W. Iskra, Jill Cranston Bentz, Spilman, Thomas & Battle, Charleston, WV, for Defendant Coventry Health & Life Insurance Company.

## MEMORANDUM OPINION AND ORDER

GOODWIN, District Judge.

Now pending is Plaintiffs' Motion for Ruling on the Substantive Basis of Plaintiffs' Motion to Remand, which the court will treat as a motion to dismiss for lack of subject matter jurisdiction. For the reasons that follow, the motion is **DENIED**.

### I. Background

This action arises from the double murder-suicide of Robert Cleavenger and his wife and daughter. The suit was brought in state court in May 2000 by the Cleavengers' estates and on behalf of Cleavenger's surviving minor son.

In October 1998, Robert Cleavenger found his wife with her boyfriend. Distraught over this discovery and the impending dissolution of his marriage, he battered his wife, overdosed on prescription medications, and slashed his wrists. Following this first suicide attempt, he was admitted involuntarily to Sharpe Hospital on October 5, 1998. Cleavenger's admitting and attending physician, Dr. Aboraya, diagnosed him with adjustment disorder and depressed mood. Dr. Aboraya concluded two days later that Cleavenger was no longer a risk to himself or to others, and wrote a discharge order. Dr. Pollard, who had also evaluated Cleavenger, had the authority to override the discharge decision, but agreed with Dr. Aboraya's

conclusion. Cleavenger was discharged on October 9, 1998, and referred to outpatient treatment. Cleavenger canceled or failed to keep his outpatient appointments and never received follow-up treatment. On October 17, 1998, he killed his wife and daughter, and then took his own life.

Following the deaths of the Cleavengers, plaintiffs brought suit against various doctors and health care and insurance entities alleging state law claims. On October 19, 2001, defendants removed to federal court pursuant to federal question jurisdiction. *See* 28 U.S.C. §§ 1331 & 1441(b) (1996). Specifically, the defendants maintain that plaintiffs' complaint is preempted by the Employee Retirement Income Security Act ("ERISA") even though only state law claims are alleged. *See* 29 U.S.C. § 1001 *et seq., see also Metropolitan Life Ins. Co. v. Taylor,* 481 U.S. 58, 107 S.Ct. 1542, 95 L.Ed.2d 55 (1987). Plaintiffs argue that their claims are not completely preempted, and that this court lacks subject matter jurisdiction.

Cleavenger received health insurance through a Coventry Preferred Provider Organization (PPO) underwritten by American Service Life Insurance Company (known as Health Assurance). Under his PPO plan, Cleavenger was free to choose his health care provider. Health Assurance paid 100% of costs of medical services provided by doctors who were participating providers, but only 80% of the reasonable charges incurred at out-of-network doctors.[1]

Health Assurance had contracted the management and administration of the behavioral health benefit of its West Virginia plans to Managed Care Services Mainstay of Central Pennsylvania, Inc. ("Mainstay"). Mainstay performs network development, utilization review, and quality assurance functions in the area of behavioral health. Under the utilization review process, Mainstay makes medical necessity determinations after receiving clinical data from providers and comparing it to internal criteria. Mainstay does not purport, however, to provide medical care, nor do the treating physicians participate in the utilization review process.

Shelley Watters was Cleavenger's Mainstay case manager. During Cleavenger's confinement at Sharpe Hospital, she spoke with Sharpe's utilization review director concerning Cleavenger's psychiatric evaluation and charts. She approved medical necessity for Cleavenger's stay at Sharpe through October 8, 1998. After Cleavenger's discharge, she wrote him with a contact for questions regarding his coverage. She attempted, unsuccessfully, to reach him by phone. She never spoke with Cleavenger's attending physicians and had no input into their decision to discharge him.

Florence Hatton, a social worker at Sharpe, was responsible for arranging a follow-up appointment for Cleavenger. The outpatient mental health facility closest to Cleavenger's home—Valley Mental Health in Grafton, West Virginia—was a non-network facility. Hatton claims that because Cleavenger specifically rejected this facility, she scheduled an appointment with University Health Associates at Chestnut Ridge Hospital in Morgantown—a participating provider—on October 12, 1998. Plaintiffs allege that Cleavenger was referred to the Chestnut Ridge clinic because of financial incentives. In any case, Cleavenger later rescheduled his appointment and never received treatment from Chestnut Ridge or from any other outpatient facility.

---

**1.** Participating providers are doctors who have contracted with Health Assurance or Mainstay to provide services to insureds at an agreed-upon fee schedule.

642

## II. Discussion

An action may be removed to a federal district court if it is one over which the district court would have original jurisdiction. 28 U.S.C. § 1441(b). District courts have original jurisdiction over actions arising under the laws of the United States. *Id.* § 1331. An action arises under the laws of the United States for purposes of section 1331 if the federal claim appears on the face of a well pleaded complaint. *Franchise Tax Bd. v. Construction Laborers Vacation Trust*, 463 U.S. 1, 9–12, 103 S.Ct. 2841, 77 L.Ed.2d 420 (1983). Here, defendants argue that removal is proper under the complete preemption exception to the well-pleaded complaint rule. Where federal law completely preempts state law claims, this exception allows removal to federal court even if no federal claims appear in the complaint. *See Metropolitan Life*, 481 U.S. at 63, 107 S.Ct. 1542.

Complete preemption contrasts with substantive preemption, which preempts state law but does not, as a defense, confer federal jurisdiction. Claims that fall under ERISA's civil enforcement provision, section 502(a)(1)(B), are completely preempted. *See McCutcheon v. Valley Rich Dairy*, 81 F.Supp.2d 657, 659 n. 2 (S.D.W.Va.2000) (Haden, J.). Under this provision, a plan participant or beneficiary may sue to recover benefits due under a plan, to enforce the participant's rights under the plan, or to clarify rights to future benefits. *See Pilot Life Ins. Co. v. Dedeaux*, 481 U.S. 41, 53, 107 S.Ct. 1549, 95 L.Ed.2d 39 (1987). On the other hand, section 514(a) mandates application of federal law but does not create jurisdiction. *Id.* The question before the court is whether plaintiffs' claims fall under the civil enforcement provision.

The Fourth Circuit has not developed a method to decide whether claims are with-in the scope of section 502(a). Other courts make the determination by drawing a distinction between challenges to quantity of benefits and quality of benefits. *See, e.g.,* In re *U.S. Healthcare, Inc.,* 193 F.3d 151, 162 (3d Cir.1999); *Dukes v. U.S. Healthcare, Inc.,* 57 F.3d 350, 357–59 (3d Cir.1995). These courts find complete preemption where an ERISA beneficiary or plan participant challenges the administrative denial of a medical benefit due under the plan or where the plaintiff complains of the quantity of benefits received, but not where the quality is challenged. *Id.* Many district courts within the Fourth Circuit have adopted the quantity-quality distinction. *See, e.g., Person v. Physicians Health Plan, Inc.,* 20 F.Supp.2d 918, 921 (E.D.Va.1998); *Dykema v. King,* 959 F.Supp. 736, 739 (D.S.C.1997); *Santitoro v. Evans,* 935 F.Supp. 733, 735 (E.D.N.C. 1996).

The court adopts this analysis, and finds that plaintiffs are attacking the administration of benefits. They have alleged the following claims against Shelley Watters: 1) failure to adequately monitor Cleavenger during his outpatient treatment; 2) failure to obtain or otherwise cause Cleavenger's readmission to Sharpe or another inpatient facility; and 3) failure to provide adequate warnings to Cleavenger's family members, who were foreseeable victims of his mental illness. Second Amended Compl. P. 81. Against Mainstay, plaintiffs allege only vicarious liability for Watters' negligence. In response to interrogatories by Health Assurance, plaintiffs explained that

> pursuant to [the PPO Plan] Robert Cleavenger was encouraged, if not required, to obtain mental health care from only participating providers within the Health Assurance/Mainstay network. The purpose of this is clear—by virtue of its contracts with network pro-

viders. Health Assurance was able to control costs associated with health care in a manner which it could not do when services were provided by out-of-network providers with whom no contract existed.

As defendants note, plaintiffs' claims clearly implicate the utilization review process. Plaintiffs argue, however, that Mainstay's role as an arranger of medical treatment makes its determinations "mixed eligibility and treatment" decisions not subject to the complete preemption exception.

Plaintiffs rely primarily on *Dukes v. U.S. Healthcare, Inc.*, 57 F.3d 350, and its progeny, which reason that by implementing policies or making coverage decisions as part of a cost-savings plan, the health maintenance organizations (HMOs) and their doctors lower the standard of care provided to patients. *See, e.g.*, In re *U.S. Healthcare, Inc.*, 193 F.3d at 161–62; *Dukes*, 57 F.3d at 356–57. Those cases involve utilization review determinations by HMO doctors or administrators. *See Rubin–Schneiderman v. Merit Behavioral Care Corp.*, 163 F.Supp.2d 227, 231 (S.D.N.Y.2001). HMOs' dual role as both medical provider and plan administrator means that medical negligence claims against HMOs arising from denial of authorization for treatment implicate the quality of care received, and are not completely preempted. *Id.* The court must determine whether this rationale applies to the case at bar.

The instant case is distinguishable from the *Dukes* line of cases because it concerns an independent utilization review agency and a more traditional fee-for-service plan. A well-reasoned Southern District of New York case by Judge Martin is especially pertinent to the decision this court must make. *Rubin–Schneiderman* also involved the attempted suicide of a PPO insured and allegations of negligence in refusing coverage. In that case, the plaintiff was a young man who suffered from various psychiatric disorders. He was a member of a Blue Cross PPO. His physician recommended inpatient psychiatric treatment at a hospital. Merit Behavioral Health Corp. performed utilization review procedures for the insurer. Its representative informed the plaintiff that he would have to undergo a pre-admission psychiatric evaluation to determine whether his policy would cover inpatient treatment. The evaluating physician also recommended inpatient treatment. Nonetheless, Merit denied coverage during its utilization review procedure and instead recommended intensive outpatient treatment. Seven months later, the plaintiff attempted suicide.

The insured brought suit, alleging that Merit was negligent in refusing coverage for inpatient treatment. Judge Martin reasoned that utilization review decisions by Merit denying coverage for requested treatment related to the administration of plan benefits, and not to the provision of medical care. *Rubin–Schneiderman*, 163 F.Supp.2d at 230. The court noted that "Merit's role was confined to informing a patient *before* receiving treatment whether that treatment would be covered under the plan. Merit's doctors were not Plaintiff's treating physicians, nor did Merit purport to provide Plaintiff with medical services." *Id.* at 231 (emphasis in original). The case at bar is factually similar, and likewise distinguishable from the *Dukes* line of cases.

Plaintiffs attempt to dodge this distinction by characterizing Watters as an arranger of health care services. Arrangers' actions implicate quality of treatment received. For example, the court in *In re U.S.Healthcare* found that an HMO's policy of discharging mother and newborn within 24 hours was an "essentially medi-

cal determination of the appropriate level of care." 193 F.3d at 162. The HMO was not determining what benefits were appropriate, but arranging for what it considered the appropriate level of care. *Id.* In *Dukes,* one plaintiff's husband died after a hospital refused, despite a physician's prescription, to perform blood tests; the second plaintiff's baby was stillborn after her preeclampsia went untreated. The treating doctors, through their decisions on how to treat the patients involved, arranged for medical care. *Dukes,* 57 F.3d 350, 352–53, 360.

Plaintiffs allege that Watters attempted to phone Cleavenger to elicit subjective information valuable in assessing his mental health status, that she stated in a letter to Cleavenger that she would follow his treatment and progress, and that she undertook an active role in his treatment. However, plaintiffs cannot escape the facts that Mainstay never purported to provide Cleavenger with medical services, that Cleavenger's treating physicians were fully insulated from the utilization review procedures performed by Mainstay, and that Watters never spoke directly with Cleavenger's physicians and had no input into Cleavenger's referral to outpatient care. *See Rubin–Schneiderman,* 163 F.Supp.2d at 231. Cleavenger was discharged and referred to outpatient therapy not because of a Mainstay policy that determined level of care, but because his treating physicians concluded that was the most appropriate level of treatment. It was the treating physicians at Sharpe who were the arrangers of Cleavenger's care, not Mainstay or Shelley Watters. Mainstay was performing a purely administrative role. *See Dukes,* 57 F.3d at 360–61; *Kuhl v. Lincoln Nat'l Health Plan of Kansas City, Inc.,* 999 F.2d 298, 301–03 (8th Cir.1993) (finding that a utilization review pre-certification decision was directly related to administration of benefits, and therefore completely preempted).

Finally, as the *Rubin–Schneiderman* court noted, nothing prevented Cleavenger from entering inpatient therapy, or seeking outpatient treatment at the Valley Health Clinic, and then suing pursuant to ERISA's civil enforcement provision to either force approval for treatment or to recover costs. *Id.* at 232; *see* 29 U.S.C. §§ 1132(a)(1)(B) & (a)(3).

At bottom, plaintiffs' claims against Shelley Watters and Mainstay attack the administration of Cleavenger's benefits. Plaintiffs essentially complain that the administration of the PPO Plan led to Cleavenger's being referred to outpatient care. These claims go to plan administration, not provision of medical services. Accordingly, plaintiffs' claims against Mainstay and Watters are completely preempted under ERISA, and this court has subject matter jurisdiction over them. The court has supplemental jurisdiction over any remaining state claims. Plaintiffs' motion is therefore **DENIED**.

The court **DIRECTS** the Clerk to send a copy of this Order to counsel of record and any unrepresented party and to publish the same on the court's website at www.wvsd.uscourts.gov