Bernard **STAUB, et al., Plaintiffs,**

v.

**GENERAL AMERICAN LIFE INSURANCE COMPANY, et al., Defendants.**

**Civ. A. No. 90–0133–H.**

United States District Court, W.D. Virginia, Harrisonburg Division.

Nov. 9, 1990.

**2.** *See Austin v. Murray,* 875 F.2d 314 (4th Cir. 1989).

**1218**

David R. Axelson, Tate & Bywater, Vienna, Va., for Bernard Staub, et al.

R. Craig Wood, Roger S. Martin, McGuire, Woods, Battle & Boothe, Charlottesville, Va., for Gen. Amer. Life Ins. Co.

Benjamin M. Butler, McKee & Butler, Winchester, Va., for First Fed. Sav. & Loan Ass'n.

## MEMORANDUM OPINION

B. WAUGH CRIGLER, United States Magistrate.

This action has been removed to this court from the Circuit Court of Warren County, Virginia, and *inter alia*, it seeks to recover accidental death benefits under a group insurance policy issued by General American Life Insurance Company (GALIC) to First Federal Savings and Loan Association of Front Royal (Association), Staub's employer. Plaintiffs' claim against GALIC is premised upon the Employment Retirement Income Security Act, 29 U.S.C. § 1101, *et seq.* (ERISA). Plaintiffs also assert certain pendent state law claims against and seek damages from the Association. Upon removal, the action was transferred to this court pursuant to 28 U.S.C. § 636(c)(2), and it is before the court on GALIC'S motion and supplemented motion for summary judgment. In these motions GALIC asserts that no genuine issues of material fact exist, and that it is entitled to judgment as a matter of law on three grounds: a) that the decedent, Michael Staub, did not die as a result of an accident; b) that Michael Staub was not an employee of First Federal Savings and Loan Association of Front Royal (Association) at the time of the insurable event; and c) that the insurance coverage here in issue terminated prior to the occurrence of the insurable event and was not extended by the Association before that occurrence.

At oral argument held before the court on October 29, 1990 counsel for GALIC conceded that genuine issues of material fact exist as to the questions of whether Staub was an employee of the association at the time of his death and whether the occurrence was an accident within the meaning of the policy. The parties tendered in open court a Stipulation of Facts (Stipulation) together with 47 stipulated documents (Exhibits 1–47). Therefore, the only remaining question on GALIC's motion for summary judgment is whether the

Association effectively elected to continue insurance coverage of Staub through the date of an insurable event, here the date of his alleged accidental death on September 1, 1989. Both plaintiffs and GALIC offer that no genuine issues of material fact exist, and that the court should decide this issue as a matter of law. Before doing just that, however, a factual background should be developed.

### FACTS

In July, 1985, Michael Staub became employed by the Association and was provided with attendant employee benefits; including life and accidental death insurance coverage. Between July, 1985 and his death at approximately 1:00 a.m. on September 1, 1989, Staub became enrolled in the life and accidental death insurance plan secured by the Association from the defendant GALIC for all its employees. This group policy issued in December, 1985 was in effect at all times relevant to this action. At the time of Staub's death, the named beneficiary on the policy was his father, Bernard Staub, one of the plaintiffs.

In December, 1986, Staub was promoted to the position of Treasurer and Chief Financial Officer of the Association. All was not well in Camelot, however, and on October 4, 1988, the Association's executive committee placed Staub on probation for failing to abide by certain of the Association's investment policies. (Exhibit 10). In July, 1989, Staub issued two post-dated checks to the order of another institution which, when drawn on his account at the Association, caused an overdraft. This, according to the stipulation of the parties, was not the first time such overdrafts had occurred. (Stipulation 11).

Although Staub was listed among those employees on the Association's payroll for July, 1989, he was placed on administrative leave with pay, effective July 31st, and he never returned to "active work on a full-time basis" as that term is defined under GALIC's group policy. (See, Exhibits 5 and 16). The minutes of the Association's Executive Committee meeting on August 3, 1989 give some insight into the depths of

Staub's problems at that time, and they reflect the action intended to be taken with regard both to the financial predicament he had generated and his employment future with the Association. (Exhibit 17). Suffice it to say that arrangements were being formulated to recoup the losses suffered as a result of Staub's actions, and he was expected to "resign from his position with the Association" (Id.). This resignation, however, never was drawn or tendered before Staub died.

The month of August, 1989 saw a number of events transpire. Staub turned in his keys to the Association's offices, and he executed a deed in lieu of foreclosure on certain loans that had been secured by his real estate. Other guarantee or surety documents were drawn and executed by Staub and his parents to secure the repayment of the funds Staub owed the Association. (Stipulations 15–25). In addition, the Association arranged for and paid Staub's entire August salary, which theretofore had been paid semi-monthly, and such was deposited to his account. (Exhibit 21).

While it has been conceded by GALIC in the affidavit of Phyllis Crabtree, Vice-President of Virginia League Services, Inc. (VLS), the agent for GALIC, that there was no form designated or utilized for the purpose of reporting elections by an employer to continue coverage on employees, there is ample, undisputed evidence in this case that the Association provided a listing of all covered employees on a monthly basis under a document entitled "Life Insurance Transmittal" (transmittal). The transmittal for the billing date August 15, 1989 showed that Staub's employment was to cease August 31, 1989. (Exhibit 27). This transmittal was sent in the regular course of mail to VLS on August 31, 1989 with a check in payment of the premium for the group of employees listed thereon. The payment of premium reflected a reduction from the previous sums paid in the amount of $24.00 which represented the portion of the premium attributable to removal of Staub from coverage. This transmittal was not received by VLS until September 5, 1989. It is the events that occurred

between the mailing of the transmittal and its receipt that are at the heart of defendant's motion for summary judgment.

At approximately 1:00 a.m. on September 1, 1989 Staub died of drowning after the vehicle he was operating crashed into a creek near Augusta, West Virginia. It is uncontroverted that the officers of the Association heard of the event in the early morning hours of September 1st, and at 2:09 p.m. the same day, after consultation with legal counsel, the Association prepared and sent by facsimile to VLS a letter and an amended transmittal form. The letter informed VLS that an error had been made, and that Staub actually was on vacation pending receipt of his resignation.[1] (Stipulation 30; Exhibit 30). The letter asked that the records of VLS be changed to reflect the correction. Later on September 1, 1989, an officer of the Association sent by mail a check for $24.00, representing the premium attributable to Staub's coverage into September, together with copies of the amended transmittal and letter. (Exhibit 31–33). These were received on September 6, 1989, a day after the original transmittal of August 31, 1989 was received. After Brian Staub qualified as Administrator of Staub's estate, and on September 11, 1989, an officer of the Association submitted a form notifying the estate of Staub's termination from membership in the Association's retirement plan on account of his termination from employment by his death on September 1, 1989. (Exhibit 37).

Thereafter, the administrator gave notice of Staub's death, with attendant documents, to GALIC. Under the terms of the life insurance provisions of the policy, GALIC paid the death benefit of $75,-000.00. Though provided with the Association's documentation, GALIC denied payment under the accidental death provisions of the policy.[2] This action then ensued

against both the employer on state law grounds and the carrier under ERISA.

## DISCUSSION, FINDINGS AND CONCLUSIONS

■ In assessing the merits of GALIC's motion, the court first observes that since ERISA preempted all state law governing the rights and obligations of the parties to an ERISA-regulated plan, the court must rely on federal common law to decide such issues. *Firestone Tire & Rubber Co. v. Bruch*, 57 U.S.L.W. 4194, 489 U.S. 101, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989); *Pilot Life Ins. Co. v. Dedeaux*, 481 U.S. 41, 107 S.Ct. 1549, 95 L.Ed.2d 39 (1987); *Adkins v. Reliance Standard Life Insurance Company*, 917 F.2d 794 (4th Cir.1990). Accordingly, while the law of the state wherein the policy was issued and under which the claim otherwise would have arisen but for the preemptive effect of ERISA might require or favor a particular construction of a plan's provisions, that construction does not necessarily obtain. This is true because the development of federal common law on the issues arising out of ERISA–related litigation must implement the Congressional intent of the Act to "promote the interests of employees and the beneficiaries in employment benefit plans ..." *Shaw v. Delta Airlines Inc.*, 463 U.S. 85, 90, 103 S.Ct. 2890, 2896, 77 L.Ed.2d 490 (1983). To the extent that such intent conflicts with the law of the state that conceivably has the most significant contacts with the case, the state law must yield to a construction of the plan provisions more likely to achieve the intent of Congress.

The most recent example of such a method of developing federal common law on the issues arising under ERISA is *Adkins*. In *Adkins* the court was faced with a plan interpretation issue of first impression. Reviewing general encyclopedic law on the

---

1. The stipulations and exhibits reflect that on March 27, 1989, before the events leading to his indebtedness to the Association occurred, Staub had tendered his vacation schedule. That schedule reflected he would be on vacation August 31 through September 1, 1989.

2. These documents were generated by the Association's personnel after September 1, 1989 under the direction of one of the Association's officers, and were produced in order to reflect that Staub was on vacation when he died instead of reflecting that he was terminated on August 31, 1989.

subject of insurance policy interpretation, the court declined to apply the state law of the jurisdiction wherein the district court sat and, instead, applied decisional authority from Kentucky as reflecting the federal common law on the subject.[3] Therefore, while the law of Virginia might be instructive on the issue before this court, it is not at all binding, particularly where the general law or laws of other states provide authority more in line with congressional intent.

Essentially, GALIC's motion for summary judgment requires the court to interpret the meaning of specific provisions of the plan related to the Association's right to elect continued coverage of an employee for personal insurance past the date on which the employee ceases full-time active work for the employer. The plan contract insures only the employees of the Association who participate in the plan and who "are doing work on a full-time basis ..." (Exhibit 5 at 3). By its terms, the plan terminates with respect to any employee within the group who ceases full-time active work. However, the plan allows the policyholder (here the Association) to elect continued coverage for certain categories of inactive employees, including those who have been placed on a leave of absence. (Id. at 4A para. 1) a & b). The election can not be made for more than two policy months, at the end of which period the policy terminates. (Id. at para. 1) b). According to a fair reading of the policy, the election is exclusively the employer's as individual (employee) selection is precluded. (Id. at para. 1) a). In all events, however, the policy terminates "as to any one coverage or benefit, the date the employee ceas-

es to be eligible for such coverage or benefit ..." (Id. at para. 3).[4]

According to the stipulations, there was no form provided by GALIC or VLS on which the Association could provide notice of its election to continue an employee under the above referenced plan provisions. Nevertheless, there was an established practice for the Association, on a monthly basis, to submit a transmittal form listing the names and payroll information for each employee who was to be covered under the plan for that reporting period. (See, e.g., Exhibit 15). Along with this information, the Association would forward a check reflecting the premium due for the period. There appears to be no dispute here that it was not unusual in the ordinary course of dealing between the Association and VLS for the transmittal forms, as well as the premium payments, to arrive at VLS after the beginning of each policy month.[5]

The importance of these findings is that under axiomatic federal common law, the intentions of the parties as expressed in the clear and unambiguous terms of an insurance agreement will be given effect by the courts. Here, the plan clearly placed upon the Association the duty to notify GALIC, through VLS, whether it elected to continue personal insurance coverage of an employee who ceased working on a full-time basis. *See*, Annotation, *Termination of Coverage Under Group Policy With Regard to Termination of Employment*, 68 A.L.R.2d 8, 72 (1959). The course of dealing between VLS and the Association would allow for such notice either to be contemporaneous with the beginning of a new policy month or to be given shortly thereafter. Though the plan provided that the insured (the Association) "may" have

---

3. The district court appears to have applied Virginia decisional authority although it was sitting in West Virginia. The common law of Virginia and West Virginia has a single source, and the decisional authorities in each have closely paralleled the other since West Virginia became independent from Virginia.

4. The provisions related to an election to continue coverage for personal accident death and injury insurance differed from the provisions for continued coverage and conversion rights in the employee for life insurance and associated

death benefits. Staub's life insurance coverage did continue through the period of his death, and GALIC has paid those benefits. It is the accidental death benefit that is here in issue.

5. It is clear to the court that GALIC is not defending the action on the grounds that the payment or tender of payment of the premium related to Staub came too late. Such an argument could hardly hold water under the facts of this case.

elected up to two months extended coverage for an employee on a leave of absence, it is the conclusion of this court that the plan did not automatically extend the coverage for the maximum of two month period. The court finds that the policy placed the duty upon the employer to notify the VLS of its election to continue coverage for each policy month, albeit in such form that the course of dealing between the parties permitted.

■ At this juncture it is also important to note that the general axiomatic law on the subject of group insurance reveals that the question of whether an employer has elected to continue coverage on an employee is a matter of intent. *Id.* at 76. Ordinarily a dispute over intent fosters material issues of fact, therefore, making summary judgment inappropriate. However, here, the parties have told the court that all the evidence on the subject that will be developed has been developed. Under *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) when the nonmoving party cannot offer any more evidence than has been offered on the subject, summary judgment is an appropriate vehicle through which to decide the issue. That is the case here.

■ In this action, the court is of the view that the transmittals sent by the Association to VLS are to be taken as the expression of the Association's intentions regarding the Staub election. When stipulations 13–27 and their attendant exhibits are read, only one reasonable conclusion can be reached, namely that Staub had been placed on leave with pay and had ceased active full-time work on August 31, 1989 as defined by the policy. Not only that, he had compromised the Association's financial position to the extent remedial action against Staub had to be taken to secure repayment of funds advanced by the Association to cover the financial effects of Staub's malfeasance.

There equally is no question on these facts that the Association intended that Staub officially resign on August 31, 1989, and it had paid him in advance through that date. Of course, Staub frustrated those intentions by failing to resign, unwittingly setting the stage, however, for the events that were to follow. Nevertheless, the court concludes that when it prepared and placed the transmittal of August 31, 1989 in the mail, the Association intended to limit its election of extended coverage on Staub to the policy month ending August 31, 1989.[6] In reaching this conclusion, the court further finds that in utilizing the transmittal process to communicate its intentions, the transmittal of August 31, 1989 itself was insufficient to elect continued coverage for both of the two policy months that followed his being placed on leave. To have achieved an election for the maximum period of two policy months, the Association, to be consistent with its course of dealing with VLS, would have been required to use clear language in the transmittal indicating an extension beyond August 31, 1989. It did not, and accordingly the court disagrees with plaintiff's argument that the August 31, 1989 transmittal constituted an election for the full two policy months allowed under the plan.

The complicating fact in this case follows the mailing of the transmittal on August 31, 1989 because the uncontroverted evidence in the record reveals that the Association repented of its original intent and effectively put VLS on notice of its change of mind by facsimile sent to VLS and received by VLS on September 1, 1989. This is striking because, if no other factors enter into the decisional process, the court would have to give effect to the course of dealings between the Association and VLS which allowed such transmittal to arrive after the commencement of the policy month. That being the case, the court would have no alternative on these facts,

---

6. Exhibit 25 is just another piece of this puzzle that confirms in the court's mind the intention of the Association regarding Staub's continued benefits. This document shows that the Association calculated Staub's retirement benefits to take effect September 1, 1989. If Staub was to commence early retirement on September 1, 1989, he no longer would be on leave with pay, and as the transmittal of August 31, 1989 would suggest, he would no longer be subject to the election of continued accidental death coverage.

and under the policy, but to conclude that an amendment of the transmittal occurred, and that the Association elected to extend coverage for an additional policy month. *See, Equitable Life Assur. Soc. v. Larocco,* 68 F.2d 451 (3d Cir.1933). Other facts exist, however, and they are critical.

The Association, through its officers and employees, learned of Staub's death shortly after its occurrence. According to the evidence before this court, the Association took steps to modify what it already had done by amending the transmittal. Therefore, the Association knew that the insurable event had occurred before it, from what the evidence clearly reveals, changed its mind regarding both the employment status of Staub (i.e. change from termination/resignation to vacation) and the election it had forwarded to VLS on August 31, 1989.[7] However, this court believes that as a matter of law it was too late.

In so holding the court places great emphasis on the knowledge the Association had regarding the occurrence of the insurable event before it took steps to amend its election. Neither side has offered one iota of evidence that the Association considered amending the election prior to Staub's death. Nor is there a single hint that the vacation schedule Staub tendered in March, 1989 had not been rendered completely inoperative by the events occurring between Staub and the Association once his malfeasance came to light. As indicated above, both sides suggest that all the evidence that can be gleaned on these matters has been presented to the court. These circumstances, in the court's view, compel only one conclusion; the Association elected continuation of the coverage only through August 31, 1989 and its attempts to amend its election after it learned of Staub's death were inoperative. Summary judgment will be awarded to GALIC on this ground.

Though not specifically raised, there is an equally compelling reason to find that the Association's attempts to amend the election were inoperative. That reason, too, is gleaned from the provisions of the policy wherein it is provided that personal insurance is to terminate "as to any one coverage or benefit, the date the employees ceases to be eligible for such coverage or benefit ..." (Exhibit 5, at 4A, Termination of Personal Insurance, para. 3). In this court's view, when Staub died at 1:00 a.m. on September 1, 1989, he ceased to be eligible for coverage for the accidental death that already had occurred. He was no longer insurable. As previously stated, the Association's election of August 31, 1989 was insufficient to extend coverage past the end of that particular policy month. Therefore, its attempt to amend the election, with full knowledge of the happening of the insurable event, was nothing more than an attempt to secure coverage on an employee who no longer was eligible under any policy definition or exception to have such coverage. Staub died uninsured against accidental death under the policy before this court, and the Association's efforts to revive coverage will not be condoned by this court on the record of the case. *Cf. Gudnason v. Life Ins. Co. of N. America,* 231 Va. 197, 343 S.E.2d 54 (1986). Summary judgment also will be granted GALIC on this ground.

■ That leaves for consideration the question of whether the court will retain the pendent claims brought by plaintiffs against the Association where, as here, the claims upon which the jurisdiction of the court is based are being dismissed on summary judgment. None of the parties has offered any suggestion that it would be more fair, convenient or economical to retain the remaining state law claims which have been brought only against the Association than it would be to remand the case to the state court from which it was removed or to dismiss those claims without prejudice to renew in the appropriate state forum. They offer, instead, that such decision rests in the sound discretion of the

---

7. For purposes of summary judgment, the court need not know the reason for this change of mind, though the record cries out that the proceeds from any accidental death or life insurance policy would be an easily accessible resource from which the obligors on Staub's debt could satisfy their obligations to the Association without risking any of their own assets.

court. *Mine Workers v. Gibbs*, 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966); *Rivanna Trawlers Unlimited v. Thompson Trawlers*, 840 F.2d 236 (4th Cir.1988). As no independent federal court jurisdiction exists as to these claims against this sole remaining defendant, and because the court believes that these claims can better be determined by the appropriate state court under circumstances not unfair or inconvenient to the parties and without an unnecessary waste of judicial resources, the court will remand the remainder of the action to the Circuit Court of Warren County, Virginia from which it was removed, which court thereupon may proceed with the disposition of the action. 28 U.S.C. § 1447.

An Order will enter accordingly.