**Rosemary Swain RACKNOR, Plaintiff,**

v.

**FIRST ALLMERICA FINANCIAL LIFE INSURANCE COMPANY, Defendant.**

**No. CIV. A. 99–40134.**

United States District Court,
E.D. Michigan,
Southern Division.

Nov. 5, 1999.

Gerald R. Goulet, Rex C. Anderson, Davison, MI, for Rosemary Swain Racknor, plaintiff.

Francis R. Ortiz, Dickinson, Wright, Detroit, MI, for First Allmerica Financial Life Insurance Company, defendant.

## MEMORANDUM OPINION AND ORDER

GADOLA, District Judge.

Before the Court is a motion by Defendant First Allmerica Life Insurance Company for entry of judgment in its favor. For the reasons set forth below, this Court **GRANTS** Defendant's Motion for Entry of Judgment in Favor of Defendant and **DISMISSES** the case.

### Findings of Fact

Plaintiff Rosemary Swain Racknor is the beneficiary and former girlfriend of Carmelo "Carlo" Amante, the decedent whose employee benefit insurance plan is at issue in this action. The insurance plan at issue is underwritten by Defendant First Allmerica Financial Life Insurance Company.

On July 3, 1998, Amante was found dead in his vehicle with a gunshot wound to his head. The Plaintiff filed for benefits with Defendant's plan administrator. The administrator paid benefits under the "life benefit" section of the insurance plan but refused to pay under the "accidental death" section. Defendant asserted that Amante's death was a suicide and therefore fell within plan's exclusion of intentionally self-inflicted injury under the "accidental death" section.

Plaintiff contests Defendant's determination that she is not entitled to accidental death benefits as a result of Amante's death from a gunshot wound to the head. Plaintiff filed a breach of contract claim in state court. That action was removed to this Court as an action arising under a federal question because, according to Defendant, Plaintiff seeks to recover benefits allegedly due under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 et seq.[1] Defendant now asks this Court for a judgment in its favor.

The administrative record contains the following facts. At the time of his death, Carmelo Domenico Amante was a 22-year-old employee of Tractor Supply Company. Amante began working for Tractor Supply Company November 1997 and was insured under the benefit insurance plan at issue effective February 8, 1998. Although Amante was married and had two minor children, he selected a former girlfriend, the Plaintiff in this action, as his beneficiary under this insurance plan. Under the insurance plan, Amante was insured for basic life insurance in the amount of $24,000 and accidental death coverage in the amount of $24,000.

In January 1999, Defendant paid Plaintiff the $24,000 owed under the basic life insurance but would not pay the additional $24,000 accidental death coverage because Defendant concluded Amante's death was a intentionally self-inflicted.

### 1. Certificate of Death

To determine whether Amante's death was self-inflicted, Defendant first looked to the certificate of death. The Medical Examiner wrote on the certificate of death that the immediate cause of death was a "head wound" and that it is "undetermined" whether that condition resulted from an accident, suicide, or homicide. Def.'s Ex. A.

Defendant thereafter sought additional information on the circumstances of Amante's death, including an autopsy report

---

1. The insurance plan at issue states in the section on General Provisions that "[t]he coverage described herein is intended to provide ... benefits pursuant to an employee welfare benefit plan within the meaning of ERISA." Def.'s Ex. C § 6.0. The decedent's application for the insurance plan specifies that:

> The coverage being applied for is intended to provide benefits pursuant to an employee welfare benefit plan or plans within the

meaning of ERISA. The employer hereby grants to First Allmerica, to the fullest extent permitted by law, discretion to make claim and eligibility determinations under First Allmerica's group insurance policy or policies and to interpret any provisions of the employee benefit plan necessary to make these determinations.
Def.'s Ex. D ¶ 23.

from the Lapeer County Medical Examiner's Office, the report of the Lapeer County Sheriff's Department, and several local newspaper articles.

## 2. Lapeer County Medial Examiner's Office Autopsy Report

Upon performing an autopsy, the Lapeer County Medical Examiner's Office found a gunshot wound to Amante's head with a contact entrance wound in his mouth, presence of soot on his tongue and palate, perforation of his skull and brain, and an exit wound on right side of his head. Def.'s Ex. B(4). The Forensic Science Division of the Michigan State Police found no trace of alcohol in his blood or urine. Id. In the opinion of the Medical Examiner's Office, Amante died from the gunshot wound and no other trauma or natural disease contributed to his death. Id. The Medical Examiner's Office concluded that "[b]ased on the circumstances and autopsy findings, the manner of death is undetermined." Id.

## 3. Lapeer County Sheriff's Department Report

According to the Lapeer County Sheriff's Department, Amante's car drove off the roadway into a ditch, across the lawn of 4351 Bowers Road in Attica, and came to rest in a wooded area. Def.'s Ex. B(5) at 2. The damage to the vehicle was minimal although the passenger-side window was broken. Id. at 2–3. The gear shift knob was in "Reverse" and the key was in the ignition. Id. at 11. The head lights and the ignition were turned on. Id. at 22. The lab test showed that the car was traveling at approximately 35 miles per hour when Amante was shot. Id. a 23. The Sheriff's Department found glass and brain matter away from the car consistent with this conclusion. Id.

Amante was found slumped in the front seat, with his legs under the driver-side dashboard near the gas and brake pedal and his head next to the passenger door, his right arm under his body and his left arm up and over his body. Id. at 3–4. His right arm and right-hand fingers were straight; his left arm was bent and his left-hand fingers were curled. Id. at 22. The doctor who performed the autopsy pointed out to the Sheriff's Department that Amante's tongue was black from a gunpowder burn, but there were no powder burns on his lips or teeth, indicating that the barrel of the gun was in Amante's mouth when it was fired. Id. at 22.

No weapon was found inside the car. Id. at 4. The Sheriff's Department extensively searched the surrounding area for the weapon but could not find it. Id. at 25–26, 27. The Sheriff's Department distributed flyers throughout the neighborhood requesting any leads in their search for the weapon and reassuring residents that Amante's wounds were self-inflicted. Id. at 26.

According to Amante's wife, Amante had been very quiet for the two days preceding his death and would not explain what was wrong when she asked. Id. at 16. According to his coworkers, however, Amante had been in good spirits the evening of his death. Id. at 5–6. He left work between 5:00 p.m. and 6:00 p.m., went out to eat with a colleague, and returned to work for a store meeting that began around 9:00 p.m. Id. at 6. After the meeting, Amante went to a friend's house, drank two 16–ounce beers, and left by himself between 12:30 a.m. and 1:00 a.m. Id.

According to interviews conducted by the Sheriff's Department, there were several troubling events in the years and months that preceded Amante's death.

Amante and his wife, Misty, were married in March 1995. Id. at 15. The couple separated in February 1997; she moved to Kentucky in June 1997, began dating a man her sister had introduced, and then moved in with that man in December 1997. Id. Amante and his estranged wife reunited in May 1998. Id. Amante was convinced that Misty's child was also his son only after receiving the results of a pater-

nity test that was conducted around the time the couple reunited. *Id.*

During the separation from his wife, Amante dated Plaintiff, and she became pregnant. *Id.* at 7. Amante's mother said that Amante gave Plaintiff money for an abortion, but she kept it and did not get an abortion. *Id.*

A car Amante owned with Plaintiff was under threat of being repossessed because payments were not being made. *Id.* at 14, 15. Amante had pawned a number of his possessions and borrowed money while he was with Plaintiff. *Id.* at 24. The former owner of a video store recently had visited Amante's apartment because Amante owed him money. *Id.* at 11.

Amante's father admitted that Amante had owned a .357 snub-nose revolver that he carried in his vehicle, but the father had taken the gun from the car, disassembled it, and threw it in the swamp behind the house so that Amante would not do anything "crazy" with it. *Id.* at 15.

In mid-August 1998, an anonymous caller stated to the Sheriff's Department that the man with whom Amante's wife had lived during the separation had hired three people to come to Michigan to kill Amante. *Id.* at 18. Two of the three people allegedly hired were friends of Misty's sister. Misty told the Sheriff's Department that her sister had mental problems and had been hospitalized and kept under watch. *Id.*

The Sheriff's Department concluded that Amante suffered a self-inflicted gunshot wound to the head while sitting in the driver's seat of his car, with the motor running and the car traveling at approximately 35 miles per hour and that wherever the gun may have fallen, it must have been picked up by someone else. *Id.* at 3–4, 22, 23, 26. The Sheriff's Department explained to Amante's family that "it could have only been self-inflicted," that they did not consider it a "homicide," and that they "cant [sic] prove it was anything than susicide [sic]." *Id.* at 26.

The Sheriff's Department reviewed this case with an expert in private practice who concurred with the Department's conclusion that Amante's death was a suicide. *Id.* at 27. The Department also reviewed the case with a member of the Violent Crime Unit who agreed that Amante's death was a suicide and "cant [sic] be anything other." *Id.* at 28.

The Sheriff's Department considered the case "closed" by mid-October 1998. *Id.* at 28.

### 4. Local newspapers

In addition to collecting the reports discussed above, Defendant's investigator collected and reviewed several local newspaper articles on the events surrounding Amante's death. *See* Def.'s Exs. B(4), B(6) (the articles cited below are from these exhibits).

The newspaper articles reflect the evolution of the investigation of Amante's death, from being initially considered as a traffic accident, to being classified subsequently as a homicide, and to an eventual conclusion that it was a suicide.

The articles appearing shortly after Amante's death explain the basic facts surrounding the death, including the cause of Amante's death, where and when the car was found, and a few details about Amante's personal life. *See* Amy Chodacki, *Detective Says Crash Victim Was Murdered,* The County Press, July 8, 1998; Tom Gromak, *Man's Crash Death Ruled Homicide,* Flint Journal, July 8, 1998; Debra Wegner–VanDenBerg, *Mystery Surrounds Shooting,* Tri–City Times, July 8, 1998.

Later articles begin to show some hesitation on the part of the officials investigating the death. *See* Joyce Bonesteel, *Reward May Be Offered for Killer,* The County Press, July 12, 1998; Karen Anthony, *Homicide Investigation Continues in Burnside Township Man's Death,* The Banner, July 13, 1998; Diana Farley,

*Shooting Remains a Mystery,* Tri–City Times, July 15, 1998.

The final round of local articles relay the final determination by the Sheriff's Department that Amante's death was a suicide. *See* Amy Chodacki, *Suicide, Not Murder,* The County Press, July 19, 1998; Debra Wegner–VanDenBerg, *Shooting Death Now Ruled a Suicide,* Tri–City Times, July 22, 1998; Tom Gromak, *Ruling Outrages Family,* Flint Journal, July 23, 1998; Karen Anthony, *Amante's Family Say Findings are Untrue,* The Banner, July 27, 1998.

Plaintiff and Defendant agree that Amante died from a gunshot wound to the head. Indeed, there appears to be no doubt that the cause of Amante's death is the severe trauma caused by such a gunshot wound. The parties disagree about whether that wound was "inflicted by person or persons unknown", as Plaintiff alleges in her Complaint, or self-inflicted, as Defendant alleges.

In support of its contention that Amante's death was self-inflicted, Defendant relies on the administrative record summarized above.

In support of her contention that Amante's death was "inflicted by person or persons unknown," Plaintiff asserts that decedent did not fit the profile of a suicidal person: he was in good physical health, he had no history of mental illness, no psychological problems, and no financial problems that would explain his death. Pl.'s Resp. at 3. Absent a motive to end his own life, Plaintiff contends that the investigators should not have concluded that Amante's death was a suicide. Plaintiff asserts that "[i]t was established ... that all of the witnesses [interviewed by the Sheriff's Department] commented that the decedent would never commit suicide, that he had no reason and he was not the type to do so." Pl.'s Resp. at 5. This is inaccurate and mischaracterizes the statements in the Sheriff's Department Report.

Plaintiff further contends that the Sheriff's Department merely offers theories with no proof and that the autopsy was flawed because the Medical Examiner did not test for nitrate residue on decedent's hands. Plaintiff asserts that the conclusion in the Sheriff's Department Report that Amante's death was self-inflicted is "illogical" and "absolutely unbelievable" and that a more logical theory is that decedent was followed, stopped at gunpoint, and shot by someone seeking revenge. Pl.'s Resp. at 7–8. According to Plaintiff, "[t]he record of this investigation relied upon by the defendant is replete with and consists of nothing but, conjecture, assumptions, theories and possibilities; it presents not one iota of actual substantive evidence." *Id.* at 9.

Beyond these assertions, Plaintiff has not offered any substantive reason for concluding that the administrative record is internally inconsistent, that the plan administrator overlooked some significant piece of evidence that would affect the decision, or that Defendant acted in bad faith.

**Discussion**

**1. ERISA**

██ While the Complaint alleges breach of contract, Plaintiff's claim is brought under an ERISA-regulated employee benefit plan within the purview of Title 29 of the United States Code. *See* 29 U.S.C. §§ 1003, 1132(a)(1)(B). In *Pilot Life Insurance Co. v. Dedeaux,* 481 U.S. 41, 54–55, 107 S.Ct. 1549, 95 L.Ed.2d 39 (1987), the Supreme Court held that ERISA's civil enforcement remedies provided in Section 502(a) of ERISA were intended by Congress to be the exclusive remedy for claims under ERISA plans. Plaintiff's state law claims are therefore preempted by the remedy provided in ERISA, and this action is governed by that law rather than by state contract law.

**2. Standard of Review**

██ According to the suggested guidelines established by the United

States Court of Appeals for the Sixth Circuit, the Court's role in an ERISA case such as this is to (1) review Defendant's denial of Plaintiff's request for accidental death benefits based solely upon the administrative record, (2) apply the applicable standard of review, and (3) render findings of fact and conclusions of law accordingly. *See Wilkins v. Baptist Healthcare System, Inc.*, 150 F.3d 609, 619 (6th Cir.1998).[2] The Court may not admit or consider any evidence not presented to the administrator. *See id.*

 The Court reviews *de novo* a plan administrator's denial of ERISA benefits, *see Wilkins*, 150 F.3d at 613, unless the benefit plan gives the administrator discretionary authority to determine eligibility for benefits or to construe the terms of the plan, in which case an arbitrary and capricious standard is applied. *See Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989); *Wilkins*, 150 F.3d at 613; *Perez v. Aetna Life Insurance Co.*, 150 F.3d 550, 558 (6th Cir.1998) (*en banc*); *Evans v. Ameritech*, 12 F.Supp.2d 655, 658 (E.D.Mich.1998). Here the benefit plan gives the administrator discretionary authority to determine eligibility for benefits and interpret provisions of the plan. *See* Def.'s Ex. D ¶ 23. Therefore, the appropriate standard of review is the arbitrary and capricious standard.[3]

 Under the arbitrary and capricious standard, the administrator's claim

can be overturned only upon a showing of internal inconsistency, bad faith, or some similar ground. *See Davis v. Kentucky Fin. Cos. Retirement Plan*, 887 F.2d 689, 695 (6th Cir.1989). If the plan administrator's decision is rational in light of the plan's provisions and reasonable with no abuse of discretion, then it must be upheld. *See Miller v. Metropolitan Life Insurance Co.*, 925 F.2d 979, 984 (6th Cir.1991); *Daniel v. Eaton Corp.*, 839 F.2d 263, 267 (6th Cir.1988); *Eriksen v. Metropolitan Life Insurance Co.*, 39 F.Supp.2d 864, 870 (E.D.Mich.1999).

### 3. Analysis

 This case involves puzzling and mysterious circumstances, but the test that this Court must apply is not whether this Court would have reached the same conclusion as the plan administrator, but whether Defendant's determination that Plaintiff was not entitled to accidental death benefits was arbitrary and capricious. Applying that standard to the facts of this case, this Court concludes that Defendant's decision to deny benefits was not arbitrary or capricious.

Defendant based its conclusion that Amante's injuries were self-inflicted on the thorough investigations by the Lapeer County Sheriff's Department and Medical Examiner and supplemented its conclusion with accounts relayed in local newspapers. The administrative record is not internally

2. According to the Sixth Circuit, the standard of review applicable in ERISA actions does not neatly fit under either the standard for a bench trial on the merits under Fed.R.Civ.P. 52 or the standard for summary judgment under Fed.R.Civ.P. 56, but is a "specially fashioned rule designed to carry out Congress's intent under ERISA." *Wilkins*, 150 F.3d at 618. *See Eriksen v. Metropolitan Life Insurance Co.*, 39 F.Supp.2d 864, 865 (E.D.Mich.1999).

3. According to Plaintiff, because this falls under an exception to the insurance policy, the burden of proof is on Defendant to show by clear and convincing evidence that the insured did not meet his death by accidental

means. Pl.'s Resp. at 2–3. Plaintiff offers no law in support of this contention. Furthermore, Plaintiff's contention conflicts with the arbitrary and capricious standard the Sixth Circuit has held to apply in cases such as this. Plaintiff also asks this Court to apply a presumption against suicide under Michigan law. Plaintiff contends that Michigan law controls this case pursuant to the doctrine established in *Erie Railroad Co. v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). Because this is not an action in which jurisdiction is based on diversity of citizenship, however, the *Erie* doctrine does not apply, and Plaintiff's reliance on Michigan common law is misplaced.

inconsistent nor is there any sign of bad faith on the part of Defendant. The plan administrator has not overlooked any significant piece of evidence that would affect the decision, and Plaintiff has not pointed to any such evidence.

**Conclusion**

Accordingly, this Court being fully advised in the premises,

**IT IS HEREBY ORDERED** that Defendant's Motion for Entry of Judgment in Favor of Defendant [Docket Entry 6] is **GRANTED**, and this case is **DISMISSED**.

**SO ORDERED.**

### *JUDGMENT*

This action having come before this Court, the Honorable Paul V. Gadola presiding, the issues having been fully presented, the Court being fully advised in the premises, and a decision having been duly rendered,

**IT IS HEREBY ORDERED** and **ADJUDGED** that Plaintiff and Defendant take nothing and that this civil action is dismissed on the merits.

**IT IS FURTHER ORDERED** that the Clerk serve a copy of this Judgment by United States mail on counsel for Plaintiff and on counsel for Defendant.