# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

Nos. 01-3570/3648

_____

| | | |
|---|---|---|
| Sarah L. Phillips-Foster | * | |
| | * | |
| Plaintiff/Appellant, | * | |
| | * | |
| v. | * | Appeal from the United States |
| | * | District Court for the District |
| UNUM Life Insurance Company | * | of Minnesota. |
| of America, | * | |
| | * | |
| Defendant/Appellee, | * | |
| | * | |
| Nancy Ruhland, as parent and natural | * | |
| guardian of Ian G. Foster and Craig | * | |
| A. Foster, minor children; Jeramy T. | * | |
| Foster; Angela Sue Whitwam; Victoria | * | |
| Poshard; Diane Della Busta, as | * | |
| guardian ad-litem for Zoe Elizabeth | * | |
| Phillips, a minor child, | * | |
| | * | |
| Defendants. | * | |

_____

Submitted: June 10, 2002

Filed: September 4, 2002

_____

Before MORRIS SHEPPARD ARNOLD, HEANEY, and MURPHY, Circuit Judges.

_____

MURPHY, Circuit Judge.

Sarah Phillips-Foster brought this declaratory judgment action against UNUM Life Insurance Company of America which had insured her deceased husband, Mark Foster. UNUM declined to pay her the policy proceeds because of a contractual suicide exclusion and because of her suspected involvement in Foster's death. She sued the company and other beneficiaries, and the district court[1] granted summary judgment to UNUM. Phillips-Foster appeals from the final judgment dismissing UNUM from the case, and we affirm.

I.

Mark Foster worked as a pharmacist for Drug Emporium, Inc., which had contracted with UNUM to provide life insurance benefits for its employees. As a pharmacist with less than five years in the position, Foster received a basic life insurance benefit in the amount of $100,000 and accidental death and dismemberment (AD&D) coverage in "[a]n amount equal to [his] life amount." In addition he purchased "Option B" which provided supplementary life coverage in the amount of $100,000. Both the AD&D and the supplementary life insurance coverage was subject to a suicide exclusion; the basic life benefit was not.

At the time of Foster's death Phillips-Foster was the beneficiary for both the basic life and the AD&D coverage. Foster had made her the beneficiary on March 11, 1997, several weeks before their marriage, in place of Victoria Poshard, a former girlfriend. The supplemental Option B enrollment form designated Jeramy T. Foster as primary beneficiary, and Craig A. Foster, Ian G. Foster and Angela (Foster) Whitwam as contingent beneficiaries. Jeramy and Angela were Foster's children from

_____

[1]The Honorable Ann D. Montgomery, United States District Judge for the District of Minnesota.

his first marriage to Susan Larson, and Craig and Ian were children from his second marriage to Nancy Ruhland.[2]

Foster was found dead on July 18, 1997, some four months after he married Phillips-Foster and named her a beneficiary. On the morning of July 18, Foster's nephew, Brent Thompson, contacted the Minneapolis Police Department to report that Foster was missing. Later that morning his body was found on the side of St. Croix Drive in rural Dairyland Township in Douglas County, Wisconsin. The body was dressed completely in white, and the cause of death appeared to be a gunshot wound to the chest. The Douglas County Sheriff began a homicide investigation, and the police later concluded that Foster had been shot with a .44 caliber rifle. A note was found in his shoe that had writing on both sides. One side said "Jack Frazier isn't here, but it's Jimmy Bailey? or look alike?" On the other side of the note was "Geez it's 3 toughs. Hope I'm OK."

The day after discovering Foster's body, investigators from the Douglas County Sheriff's Department and the Minneapolis Police Department interviewed Thompson, Phillips-Foster, and their housemate, Greg Friesner. Phillips-Foster told them on July 19 that she had last seen Foster at Madden's Resort near Brainerd, Minnesota on the afternoon of July 17. In a statement she gave on July 29, Phillips-Foster told police that at Madden's she and Foster had talked about threats he had received from Jack Frazier and Jimmy Bailey. Thompson told the detectives that he had last seen Foster between 2 and 2:30 a.m. on the morning of July 18, when Foster told him that he was having problems with Jack Frazier and was going to meet him at a Country Kitchen to straighten things out. Thompson said that Friesner had told him that he and Foster had seen Frazier on a motorcycle at an Amoco station near their house on the evening

---

[2]Foster had no children with his third wife, Tammy Blair, who is also the sister of Phillips-Foster.

-3-

of July 17.[3]  Two of the investigators noted that during the meeting with Phillips-Foster and Thompson on July 19, neither inquired about how or where Foster had been killed.

In a second interview on July 19, Thompson told an investigator that Foster had expressed concern about his safety on July 17 because Frazier had demanded that he "make some drugs for him" or else he would "take care of [Foster] and his family." Thompson also opened a letter that Foster had left for him in the event that he died. The letter, dated July 15, 1997, expressed Foster's concern that he was in danger and provided instructions for obtaining his life insurance proceeds, for making funeral and wake arrangements, and for placing an obituary in Twin Cities and Eau Claire newspapers.  During this same interview Friesner reported that Frazier was "totally obsessed" with Phillips-Foster and that he had made threats against Foster because of his relationship with her.

Phillips-Foster had been romantically involved during the 1990s with Jack Frazier and with James "Jimmy" Bailey, Jr., and both men were known to have been angry with her and Mark Foster.  Bailey and Phillips-Foster had had a child together in 1991 – Jake Phillips.  Bailey also suspected that he might be the father of Phillips-Foster's first child, Roy Phillips, who had been born in 1990.[4]  In the mid-1990s Jack Frazier moved in with Phillips-Foster and her roommate/lover, Jackie.  Frazier and Phillips-Foster developed a romantic relationship, and Jimmy Bailey became involved with Jackie and later married her.  Frazier and Phillips-Foster continued their relationship until February 1997, when she ended it and moved in with Mark Foster.

---

[3]On July 29 Friesner gave a statement to Douglas County investigators in which he said he was with Foster on July 18 between midnight and 1:00 a.m., when he "saw a man riding a motorcycle who I know as Jack Frazier."

[4]Bailey later dropped this claim, and Phillips-Foster says that Roy is the son of another man, Tom Brown.

Phillips-Foster and Foster were married on April 1, 1997. Tensions between Bailey, Frazier, Phillips-Foster, and Foster came to a head in May, 1997, at a custody hearing on the competing claims of Bailey and Phillips-Foster. Frazier allegedly made threats against Foster at the hearing, and Bailey allegedly assaulted both Foster and Phillips-Foster after losing the custody battle.

Douglas County investigators interviewed Jack Frazier at a restaurant about a week after Foster's body was discovered. He told them that when he read in the newspaper that Foster had been found dead in Dairyland, Wisconsin, he knew he would be contacted by the police because Phillips-Foster was trying to set him up. When asked about his whereabouts on July 17 and 18, he claimed that he had traveled from Minneapolis to Salem, Massachusetts on July 14 and returned home on the evening of July 18. He supported his alibi by turning over an itinerary from Yada Systems for his travel on those dates, a dated Northwest Airlines baggage claim check, and his personal calendar.

After talking with Frazier, the Douglas County Sheriff's Department became increasingly suspicious that Thompson, Friesner, and Phillips-Foster were involved in the death of Foster and that he might have had a role in his own death. They began to suspect that the note in Foster's shoe about Frazier and Bailey, the July 15 letter to Thompson about Foster's fears, the reported sighting of Frazier at the Amoco station the night before the murder, and the story about meeting Frazier at a Country Kitchen were intended to lead them to the conclusion that Frazier had killed Foster. The investigators also came to suspect that the death scene was selected to lead them to Frazier since he owned property in Pine County, Minnesota, which was not far from the murder site in Douglas County, Wisconsin.

The suspicions of the Douglas County Sheriff's Department heightened after further interviews with Foster's children, a former girlfriend, and a coworker. Jeramy Foster told investigators that his father had owned several guns, one of which was a

.44 caliber carbine. He reported that he had last seen the gun in a cabinet at his father's St. Paul storage unit, and that he had given his father the only key to the cabinet about five to six weeks prior to his death.[5] When investigators searched the storage unit, they found that the gun was missing. The security log at the facility showed that Foster had entered his storage unit at 4:36 p.m. on July 17, and the manager identified Foster's car on a security videotape. The tape showed his car entering the lot with two or three people in the vehicle. Jeramy Foster and his sister, Angela Whitwam, also informed investigators that their father had followed a cult type of religion, called Tantra, which believed in free sex. Jeramy and Angela reported that their father had sex with other men and women, and that everyone living in the house with their father had had sex with each other at one time or another.[6]

Victoria Poshard, a former girlfriend of Foster, provided investigators with more information about his religious beliefs. She stated that Foster believed he was a voodoo priest and that he claimed to have gained his spiritual powers from shooting his teacher in a New Orleans cemetery. Foster had told her the same thing would happen to him, and that Greg Friesner was the "chosen one" who was going to kill him and inherit his worldly possessions and spiritual powers. In an affidavit submitted three months prior to Foster's death, as part of the custody battle between Phillips- Foster and Bailey, Poshard made many of the same claims. She stated that Foster studied Tantra, that he conducted rituals in his attic, that it was his destiny to be killed by Friesner so that his priestly powers would be transferred to his student, and that he had participated in ritual ceremonies in New Orleans.

---

[5]Jeramy told investigators that he had been keeping the key to the gun cabinet because he was concerned that his father might retrieve one of the guns and hurt himself.

[6]Phillips-Foster later admitted in a deposition that she had had sex with Foster and another woman and that she and Foster had had sex while another man watched. She also admitted having had sex with Friesner shortly after moving into Foster's apartment in February, 1997.

Jenny Soule, a coworker of Foster's, reported to investigators that he had told her that he had received death threats and that he had made out a letter explaining what should be done in case he was "found dead along the side of the road." Soule stated in addition that Foster had talked about rituals that took place in his attic, including one that involved marking a naked woman on a table.

Investigators also obtained a farewell videotape prepared by Foster on July 17, several hours before his death. In the videotape, Foster spoke to his unborn child and his other children and said that he loved Phillips-Foster. Foster discussed the long journey he was taking, that he would be meeting his ancestors, and that he was going to the other side. Foster told his family that he was not afraid of death and encouraged them not to be afraid. He also told them he was looking forward to seeing them again and that they would all be together again some day.

Phillips-Foster and Jeramy Foster filed notices of claim with UNUM on August 19, 1997. By early September 1997, Douglas County investigators had informed UNUM internal claims specialists that Phillips-Foster, Friesner, and Thompson were the main suspects in Foster's death, but that there was also a "high probability" that Foster himself had been involved.[7] The investigators told UNUM that they considered Foster to be a ring leader in a cult and that they were now treating his death as an insurance fraud case. They had also discovered that Foster had purchased

---

[7]On July 10, 2002, a federal grand jury issued an indictment charging Friesner and Thompson with having conspired with Foster and other persons known and unknown to commit murder in consideration for a promise of a payment of pecuniary value, in violation of 18 U.S.C. §§ 2, 371, and 1958 (a), to defraud UNUM and State Farm, in violation of 18 U.S.C. §§ 2, 1341, and 1343. Friesner and Thompson were also charged with having knowingly used and carried a firearm during and in relation to a federal crime of violence, in violation of 18 U.S.C. § 924(c)(1)-(2). Phillips-Foster was not mentioned by name in the indictment, but it does refer to a beneficiary described as "Individual A (who) married Foster in April 1997, approximately three months before Foster's death."

another life insurance policy with State Farm Insurance Company on July 2, 1997, and that he had submitted to a physical examination for the policy two days before his death. The State Farm policy carried benefits of $300,000, and Phillips-Foster, Thompson and Friesner were among the named beneficiaries.

UNUM had begun its own investigation after receiving the claim notices, and it gathered evidence from a number of sources. It obtained records from Douglas County, and it began interviewing witnesses familiar with Foster and Phillips-Foster. These interviews provided more information about Foster's belief in voodoo/Santeria and further support for the theory that he could have been involved in his own death as part of a religious ritual. Nicolle Dorrian, a former lover of Phillips-Foster, informed UNUM investigators that Phillips-Foster had told her that Foster was a high priest, that Friesner would become the leader if Foster died, and that Foster's powers would be transferred to any child she would have with him. Dorrian also stated that Phillips-Foster had told her that Foster had "lots of money" and that she would "never have to worry about money again." Jackie Bailey told UNUM investigators that she believed that Phillips-Foster was involved in the plot to kill Foster because she was the only one who knew the location of Frazier's property in Pine County, Minnesota, since she had gone there during the course of her relationship with Frazier.

Adam Fisher, a former roommate of Foster's during the mid-1990s, reported that Foster had taught him both Tantra and Santeria and that Foster had told Friesner he would have to kill him to attain sainthood. Roger Williamson, a bookstore owner specializing in voodoo and the occult, told investigators that Foster was interested in Tantra, voodoo, Santeria, and Palo Mayombe, and that Foster had rituals in his home. Williamson stated that Foster believed he was a voodoo high priest, that such priests were supposed to wear white clothing, and that Foster had claimed to Fisher that he would be killed and his soul would pass to his student.

UNUM investigators also learned that Foster may have made a "suicide gesture" in 1995, that he had been treated for depression, that he had suffered financial setbacks after his business (Quanta Press, Inc.) failed in February, 1997, that he owed the IRS between $22,000 and $28,000, and that he was in the middle of an audit at the time of his death. A 1998 deposition of Phillips-Foster confirmed that Foster was a practitioner of Santeria and that he had prepared a will on July 2, 1997, naming Brent Thompson among the beneficiaries.

On December 8, 1998, UNUM issued a rejection letter which denied coverage on both the AD&D portion of the life insurance policy and the supplemental insurance Foster had purchased. Both were subject to a suicide exclusion. On December 22, 1998, Phillips-Foster sent a letter to UNUM appealing the denial of the AD&D and supplemental insurance benefits, and on March 3, 1999, UNUM affirmed its earlier decision. UNUM also withheld payment of the $100,000 basic life benefit because it was uncertain if Phillips-Foster could legally receive payment under Minn. Stat. Ann. § 524.2-803, a statute proscribing payment of life insurance benefits to anyone who feloniously and intentionally kills the insured. UNUM apparently never formally notified Phillips-Foster that it was withholding payment of the basic life benefit.

Phillips-Foster brought this action against UNUM and other potential beneficiaries, seeking declaratory relief and monetary damages on behalf of herself and as the parent and natural guardian of Zoe Phillips (Foster's child born after his death).[8] The individuals named as defendants were Nancy Ruhland, as parent and natural guardian of Ian G. Foster and Craig A. Foster; Jeramy T. Foster; Angela Sue Whitwam; and Victoria Poshard. UNUM counterclaimed and filed a crossclaim in interpleader, and Whitwam, Ruhland, and Jeramy Foster filed crossclaims.

---

[8]A guardian ad-litem was later appointed for Zoe Phillips.

UNUM moved for dismissal of all state claims, summary judgment on the ERISA claims, and discharge upon its deposit into court of the basic life portion of the policy proceeds ($100,000 with interest at 5.88% per annum). Phillips-Foster moved for summary judgment, seeking a declaration that UNUM was obligated to pay $400,000 in benefits on the policy[9] and for other equitable relief. Ruhland, Foster, and Whitwam also moved for summary judgment.

The district court granted UNUM's motion for summary judgment, for leave to deposit funds into court, and for dismissal of state law claims. The court ruled that Foster's life insurance policy had been issued as part of an employee benefit plan and was thus subject to ERISA, that the administrator's decision to deny coverage should be reviewed under an abuse of discretion standard, and that the administrator's exercise of discretion had been reasonable. The court also granted that part of Phillips-Foster's motion which sought a declaration that the total exposure UNUM had on Foster's policy was $400,000, denied the other relief she requested, and denied other pending motions. The district court subsequently entered an order for judgment under Fed. R. Civ. P. 54(b), finding that there was no reason to delay entry of a final judgment dismissing UNUM from the case. Phillips-Foster appealed from the judgment, and UNUM filed a cross appeal to challenge the district court's finding that Foster's policy provided a total of $400,000 in benefits. Still remaining in the district court are the competing claims of the other potential beneficiaries to the $100,000 basic life benefit paid into the registry by UNUM.

---

[9]Phillips-Foster's contention was that the AD&D benefit attached to both the $100,000 basic life benefit and the $100,000 Option B supplemental insurance and thus provided $200,000 in aggregate coverage. UNUM argued in opposition that the AD&D benefit was limited to the $100,000 basic life coverage.

II.

On her appeal Phillips-Foster contends that the district court erred when it applied an abuse of discretion standard rather than a sliding scale analysis, citing Woo v. Deluxe Corp., 144 F.3d 1157 (8th Cir. 1998). She argues that UNUM seriously breached its fiduciary duties because (1) its decisionmaker, Denise Kinney, had a conflict of interest and (2) there were procedural and substantive irregularities. Phillips-Foster also claims that the denial of benefits was unreasonable even under an abuse of discretion standard, because the decision was based only upon speculation, innuendo, and bizarre stories of witnesses who lacked credibility. She asks that the judgment be reversed or the case remanded for additional findings.

UNUM responds that abuse of discretion was the correct standard for the district court to use and that the judgment should be affirmed. UNUM denies that there were sufficient irregularities to lessen the deference afforded to the administrator and that it reasonably relied on the investigations conducted by the Douglas County Sheriff's Department and its own claims analyst in reaching its decisions. UNUM cross appeals the district court's ruling that the policy afforded $400,000 in coverage. It argues that the policy language is clear that the maximum amount of coverage is $300,000 and points out that we only need to reach this issue if the judgment in its favor is overturned. UNUM has also moved to strike portions of appellant's appendix which it says are not part of the administrative record.

We review de novo the district court's grant of summary judgment, viewing the record in the light most favorable to the nonmoving party. Tillery v. Hoffman Enclosures, Inc., 280 F.3d 1192, 1196 (8th Cir. 2002). We also review de novo the district court's determination of the appropriate standard of review under ERISA. Id.

A.

Foster's life insurance plan was part of an employee benefit plan and subject to the Employee Retirement Income Security Act (ERISA), 29 U.S.C. §§ 1001-1461, so we must look to ERISA law to select the proper standard for review. Where a benefit plan gives the administrator "discretionary authority to determine eligibility for benefits," the standard of review is abuse of discretion. Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 115 (1989). See also Heaser v. Toro Co., 247 F.3d 826, 833 (8th Cir. 2001); Donaho v. FMC Corp., 74 F.3d 894, 898 (8th Cir. 1996). Such decisions "will not be disturbed if reasonable." Firestone Tire, 489 U.S. at 111.

An administrator's decision will be considered reasonable if "a reasonable person *could* have reached a similar decision, given the evidence before him, not that a reasonable person *would* have reached that decision." Donaho, 74 F.3d at 899 (emphasis in original). The administrator's decision need not be the only sensible one, so long as the decision provides a reasoned explanation, based on the evidence, in support of a particular outcome. Id. In evaluating the reasonableness of the administrator's decision, a court should consider the evidence that was before her at the time she made the final decision, but it does not do its own weighing of the evidence. Cash v. Wal-Mart Group Health Plan, 107 F.3d 637, 641 (8th Cir. 1997). A reasonable decision must be supported by substantial evidence, which is "more than a scintilla but less than a preponderance." Donaho, 74 F.3d at 900 n.10. (citation and quotation omitted). A decision supported by a reasonable explanation will not be disturbed even if another reasonable interpretation could be made or if the court might have reached a different result had it decided the matter de novo. Id. at 899-900.

B.

Phillips-Foster does not dispute that the life insurance policy provides UNUM with the discretionary authority to determine benefit eligibility, but she argues that a sliding scale analysis should be applied because she says UNUM seriously breached its fiduciary duty to her by failing to acknowledge its obligation to pay the $100,000 basic life benefit, failing to make a timely claim determination, failing to pay a repatriation benefit, failing to analyze evidence contrary to its position, failing to obtain an expert opinion on whether Foster committed suicide, and failing to provide the entire claims file to the district court.

A plan administrator's decision will be afforded less deference if a claimant presents "material, probative evidence demonstrating that (1) a palpable conflict of interest or a serious procedural irregularity existed, which (2) caused a serious breach of the plan administrator's fiduciary duty to her." Woo v. Deluxe Corp., 144 F.3d 1157, 1160 (8th Cir. 1998). A plaintiff must also "show that the conflict or procedural irregularity has 'some connection to the substantive decision reached.'" Id. at 1161 (quoting Buttram v. Cent. States, S.E. & S.W. Areas Health & Welfare Fund, 76 F.3d 896, 901 (8th Cir. 1996)).

The need to show a serious breach of fiduciary duty "presents a considerable hurdle for plaintiffs." Barnhart v. UNUM Life Ins. Co. of Am., 179 F.3d 583, 588 n.9 (8th Cir. 1999) (citations and quotations omitted). In order to prevail, the claimant must offer evidence which causes "serious doubts as to whether the result reached was the product of an arbitrary decision or the plan administrator's whim." Id. at 589 (quoting Layes v. Mead Corp., 132 F.3d 1246, 1250 (8th Cir. 1998)). Only when a claimant satisfies both tests will a "sliding scale" approach be adopted. This type of standard requires that "the evidence supporting the plan administrator's decision must increase in proportion to the seriousness of the conflict or procedural irregularity." Woo, 144 F.3d at 1162.

-13-

In arguing for a sliding scale analysis, Phillips-Foster claims that UNUM had a palpable conflict of interest, because it derived a direct financial benefit from not paying her claim, and that UNUM failed to follow proper procedures. Something like a rebuttable presumption of conflict of interest exists when the insurer is also the plan administrator, Schatz v. Mut. of Omaha Ins. Co., 220 F.3d 944, 947-48 (8th Cir. 2000), and UNUM has not articulated any "ameliorating circumstances" to rebut it. Id. at 948. Phillips-Foster says UNUM's procedure was irregular because it was silent about its obligation to pay the $100,000 basic life benefit until she filed this action and UNUM moved in interpleader to deposit the benefit with interest into court.[10] A plan administrator's failure to provide timely notice of the denial of benefits has been recognized as a serious procedural irregularity. Tillery, 280 F.3d at 1198. The irregularities cited by Phillips-Foster are insufficient by themselves to require a higher standard of review, however. Under Woo any procedural irregularity must rise to the level of a serious breach of fiduciary duty before a sliding scale analysis is required.

In order to meet the second part of the Woo test, Phillips-Foster must show that UNUM's potential conflict and failure to meet claim deadlines amounted to serious

_____

[10]Section 503 of ERISA requires employers to "provide adequate notice in writing to any participant or beneficiary whose claim for benefits under the plan has been denied," 29 U.S.C. § 1133(1), and initial claims handling must be completed within time limits prescribed by the Secretary of Labor. 29 C.F.R. § 2560.503-1(e) (1997). After Phillips-Foster filed her claim for Foster's life insurance proceeds on August 19, 1997, UNUM had 90 days to respond. 29 C.F.R. § 2560.503-1(e)(3) (1997). When UNUM failed to meet its deadline or file for an extension, Phillips-Foster's claim was deemed to have been denied. 29 C.F.R. § 2560.503-1(e)(2) (1997). She then had the right to seek review under § 2560.503-1(g) (1997). On December 8, 1998, UNUM denied her claim to AD&D and supplemental insurance benefits. She appealed that decision on December 22, 1998, and UNUM affirmed its denial on March 3, 1999. The record is unclear whether she sought review of the deemed denial of her claim to the $100,000 basic life benefit.

breaches of fiduciary duty such that "serious doubts" are raised as to whether the administrator's decision was arbitrary or the product of her whim. Barnhart, 179 F.3d at 589. The record before the administrator showed that within a month after Phillips-Foster filed her claim for the basic life benefit, Douglas County investigators had alerted UNUM that they considered her a suspect in a conspiracy to cause the death of her husband and that there was a "high probability" that Foster was involved in his own death. Moreover, Douglas County investigators asked UNUM to delay disbursement of the insurance money in order to facilitate their investigation. Phillips-Foster's right to the basic life benefit was also contested by Nancy Ruhland, Foster's second wife, who asserted that she had a superior claim because a divorce decree obligated Foster to maintain insurance coverage to secure his child support obligations. It was not unreasonable in this context for UNUM to delay its decision. Disbursement of the monies to Phillips-Foster would have invited additional litigation and potentially breached UNUM's fiduciary duties to other claimants.

UNUM's failure to meet claim deadlines was not under these circumstances a breach of its fiduciary duty. The deemed denials gave Phillips-Foster the right "to bring a civil action to have the merits of [her] application determined, just as [she] may bring an action to challenge an outright denial of benefits, Mass. Mut. Life Ins. Co. v. Russell, 473 U.S. 134, 144 (1985), and any potential harm from UNUM's failure to acknowledge its obligation to pay the basic life benefit was ameliorated by its interpleader action to deposit into court the $100,000 benefit with interest. Any bad faith claim Phillips-Foster might assert under state law based on the delayed acknowledgment of UNUM's basic life obligation is preempted under ERISA. Pilot Life Ins. Co. v. Dedeaux, 481 U.S. 41, 50 (1987). See also Walker v. S. Co. Servs., 279 F.3d 1289,1292-93 (11th Cir. 2002) (tort of bad faith refusal to pay an insurance claim is preempted by ERISA).

Phillips-Foster also argues that UNUM seriously breached its fiduciary duty by not paying the policy's $5,000 repatriation benefit. This benefit is due if the

-15-

insured dies more than 75 miles from his usual residence. Phillips-Foster has presented no evidence that the plan administrator's refusal to pay this benefit was arbitrary under Foster's policy. A condition precedent to payment of repatriation is payment of the AD&D benefit so UNUM needed to make its AD&D decision first. After determining that the suicide exclusion applied to the AD&D, it was not a breach of its fiduciary duty to refuse to pay the repatriation benefit.

Phillips-Foster contends that UNUM failed to give sufficient weight to contrary evidence and thus breached its fiduciary duty. Even if UNUM gave more weight to information which supported the conclusion that Foster was involved in a conspiracy to cause his own death, that does not establish a procedural irregularity. Phillips-Foster has presented no probative evidence that conflicts of interest led UNUM to a predetermined or arbitrary decision. The record shows that it was not unreasonable for UNUM to rely upon the tentative conclusion of Douglas County investigators that Phillips-Foster, Thompson, and Friesner were involved in Foster's death. Its own investigations also supported this conclusion. We do not find persuasive Phillips-Foster's claim that UNUM should be faulted for failing to analyze an October 1997 family court order involving the custody battle between Phillips-Foster and Bailey. Phillips-Foster claims that the family court rejected many of the allegations of bizarre activity concerning Foster that were made during the course of the custody fight because the court did not mention these matters in its findings. The fact that a court has not specifically mentioned particular evidence does not mean that it was rejected, however, and the court did indicate that Foster was engaged in voodoo and Santeria, that Phillips-Foster, Thompson and Friesner were the main suspects in Foster's murder, and that Douglas County deputies had found books in his residence on murder/suicide and pornography.

Phillips-Foster also contends that UNUM's failure to obtain an expert to give guidance in determining whether Foster committed suicide is a procedural irregularity significant enough to trigger less deferential review under Woo. Expert testimony is

-16-

required if a subject matter is outside the knowledge or experience of lay people. Sherbert v. Alcan Aluminum Corp., 66 F.3d 965, 967 (8th Cir. 1995). Where the ability to make inferences and draw conclusions is within the common knowledge of a lay person, however, expert testimony is not required. Id. There was abundant evidence in this case from which to infer that Foster had been involved in his own death. Two weeks before his death, Foster purchased additional life insurance, listing Phillips-Foster, Thompson, and Friesner as beneficiaries. Two days prior to his death he gave Thompson a letter which included his own obituary and instructions for his burial. On the day before his death, Foster was seen on a surveillance tape entering a storage unit where a .44 caliber carbine was stored in a cabinet to which he had the only key. Foster also prepared a farewell tape for his family only hours before his death. UNUM and Douglas County investigators also learned that Foster's beliefs in voodoo/Santeria may have led him to seek his own death so that his spiritual powers would pass to Friesner. Given the numerous indications that Foster had anticipated and helped bring about his own death, the determination that Foster had committed suicide with the aid of others could be inferred from the evidence without expert opinion. We therefore conclude that UNUM did not commit a serious breach of its fiduciary duty by failing to consult an expert.

Phillips-Foster also claims that UNUM is entitled to less deferential review because it did not provide the district court with a complete claims file. Phillips-Foster says that some documents should have been in the file, but are not. Some of these are in her appendix,[11] including the complete policy, her December 22, 1998 appeal of denial of benefits, UNUM's final determination letter dated March 3, 1999, an apartment lease signed by her and Foster for a term starting August 1, 1997, a complete autopsy report, a family court record, and two law review articles relating

---

[11]UNUM has moved to strike the material in Phillip-Foster's appendix which was outside the administrative record. Since some of these documents – such as Phillips-Foster's appeal and UNUM's final determination letter – should clearly have been in the claims file, the motion to strike should be denied.

to the use of psychological autopsies in deciding the issue of suicide. The State Farm statements which were reviewed by UNUM's adjuster are neither in the claims file nor in her appendix, however. Phillips-Foster alleges that, except for the law review articles, all these documents were submitted to UNUM, generated by it, or directly referenced in its record. Our examination of the disputed materials in the appendix leads us to conclude that they are neither particularly helpful nor persuasive for either side, and they do not establish a breach of fiduciary duty by UNUM.

After a thorough review, we are persuaded as a matter of law that the cited irregularities, whether taken individually or in the aggregate, do not rise to the level of serious breaches of UNUM's fiduciary duty. Phillips-Foster has thus failed to satisfy the second part of the Woo test and has not shown that a sliding scale analysis would be appropriate. We therefore conclude that the district court did not err by reviewing the plan administrator's decision under an abuse of discretion standard.

C.

Phillips-Foster contends that the plan administrator abused her discretion, by withholding the basic life benefit and by invoking the suicide exclusion to deny benefits on the supplemental and AD&D coverage, because her decisions were not supported by substantial evidence. See Donaho, 74 F.3d at 900 n.10. By the time UNUM issued its denial of coverage in December, 1998, its plan administrator had numerous pieces of evidence to support the conclusion that Foster had been involved in his own death and that Phillips-Foster had played some role in it. Two weeks prior to his death, Foster had taken out a new life insurance policy and drafted a new will. In the days immediately preceding his death, he had written his own obituary, made a goodbye videotape to his family, and visited the locker where a .44 caliber carbine was stored. It was also known that Foster was interested in voodoo/Santeria, and various people reported that Foster had talked about inflicting his death and how it was necessary for his soul to pass to Friesner. UNUM also uncovered evidence that

Foster had been treated for depression, had suffered recent financial setbacks, and had possibly made a suicide gesture in the past. Douglas County investigators reported to UNUM their suspicions that Phillips-Foster, Thompson, and Friesner were involved in Foster's death and that they had displayed no interest in learning how or where Foster had died. They had also attempted to direct the focus of the investigation toward Frazier and Bailey, and all three stood to gain from Foster's life insurance policies.

Under the abuse of discretion standard, the reasonableness or unreasonableness of a plan administrator's decision can be assessed "by both the quantity and quality of the evidence supporting it." Id. at 900. In light of the extent and weight of the evidence collected by UNUM, we conclude that the plan administrator did not abuse her discretion when she decided not to pay benefits to Phillips-Foster based on the suicide exclusion and factors suggesting that she was ineligible to receive the basic life benefit under Minn. Stat. Ann. § 524.2-803. The district court therefore did not err in granting summary judgment to UNUM, and its cross appeal on the total dollar amount of benefits Phillips-Foster could obtain under the supplemental insurance is moot.

## D.

For these reasons, we affirm the judgment in favor of UNUM and dismiss its cross appeal as moot. The motion to strike those portions of Phillips-Foster's appendix outside the administrative record is denied.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.